UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

BENJAMIN JAMES O'DONNELL,      )
                              )
                Petitioner,    )      Case No. 5:03-cv-72
                              )
v.                            )      Honorable Wendell A. Miles
                              )
DAVID GUNDY,                  )
                              )      **REPORT AND RECOMMENDATION**
                Respondent.    )
                              )

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  In late 1994, a Calhoun County Circuit Court jury convicted Petitioner of one count of

armed robbery,  MICH. COMP. LAWS § 750.529, three counts of assault with intent to commit

murder, MICH. COMP. LAWS § 750.83, four counts of felony-firearm, MICH. COMP. LAWS §

750.227b, and one count of carrying a concealed weapon, MICH. COMP. LAWS § 750.227.   On

January 6, 1995, the trial court sentenced Petitioner to concurrent terms of 20 to 40 years'

imprisonment for the armed robbery conviction, 25 to 50 years' imprisonment for each of the assault

convictions, 2 years' imprisonment for each of the felony-firearm convictions (to be served

concurrent with each other but consecutive to the other sentences), and 3½ to 5 years' imprisonment

for the concealed weapon conviction.  On May 4, 1995, the trial court also sentenced Petitioner to

1-4 years' imprisonment after he pleaded guilty to escaping jail while awaiting his trial, *see* MICH.

COMP. LAWS § 750.197.  In his first *pro se* petition, filed on June 6, 2003, Petitioner raised nine

grounds for habeas relief, as follows:

I.      At sentencing, Petitioner was denied his right to be free from double jeopardy guaranteed by the Fifth Amendment to the Constitution of the United States and Article I Section 15 of the Michigan Constitution of 1963.

II.     The trial court erred in denying Petitioner's motion to dismiss because Petitioner was denied due process of law where the police failed to seize evidence.

III.    Petitioner was denied his Sixth Amendment right to the effective assistance of trial counsel where counsel failed to object to an improper jury instruction concerning accomplice testimony, and failed to seek a mistrial where jail break testimony was permitted to enter the trial, and appellate counsel where counsel failed to raise these meritorious issues in Petitioner's appeal of right.

IV.     Petitioner was denied a fair and impartial trial when the trial court failed to give the proper cautionary instruction to the jury concerning the testimony of Russell Williams as being that of an "undisputed accomplice," and that his testimony should be treated as such, in violation of U.S. Const. Amends. V & XIV, Mich. Const. 1963, Art. 1, Sec. 17.

V.      The trial court abused its discretion when it admitted evidence pertaining to Petitioner's jail break because it had no probative value, as it was not introduced to show motive, intent, or scheme, or any other parts of the criteria of MRE 404(b), and admission of the evidence resulted in Petitioner being denied a fair trial before an impartial jury in violation of U.S. Const. Amends. VI, and XIV, as well as Mich. Const. 1963, Art. 1, Sec. 17 and 20.

VI.     Petitioner was denied his Sixth Amendment right to the effective assistance of trial counsel where counsel failed to dismiss a biased juror, acknowledge that there was no signature on the felony complaint, and failed to ask for a change of venue due to extensive publicity; and the effective assistance of appellate counsel where counsel failed to raise these meritorious issues in Petitioner's appeal of right.

VII.    Petitioner was denied his constitutional right to due process and an impartial jury where one of the jurors was biased and prejudiced towards Petitioner because they had prior confrontations with one another while the juror was a school bus driver.

VIII.   Petitioner was denied his constitutional right to due process under both the Michigan and United States constitutions because Petitioner's felony complaint had no signature.

IX.     Petitioner was denied his Sixth Amendment constitutional right to a fair and impartial trial and his Fourteenth Amendment right to due process when trial

counsel failed to request a change of venue due to Petitioner's extensive pre-trial publicity.

In August 2003, Petitioner moved the Court (docket #9) for a stay, pending exhaustion of two additional grounds; the Court granted his motion on December 12, 2003 (docket #15). On October 12, 2005, Petitioner filed a motion to amend his petition (docket #16), which the Court granted on November 8, 2005 (docket #19). In his "Amendment of Grounds" filed on December 1, 2005, Petitioner added two new grounds[1]:

> X.   Under the Fourteenth Amendment of the U.S. Constitution, as well as the Mich. Const. of 1963, Art. 1, § 2 in lieu of "retroactive change in law," the holding in *People v. Randolph*, 466 Mich. 532 (2002), rejecting the "transactional approach" to armed robbery, requires that Petitioner's conviction for armed robbery be vacated because the forceful act was not used to accomplish the taking and the force used to escape with the stolen property was insufficient to sustain the armed robbery charge.

> XI.  Petitioner's right to equal protection of laws under the United States Constitution Amendment 14, as well as the Michigan Constitution of 1963, Art. 1, § 2, will be violated if *People v. Scruggs*, 256 Mich. App. 303 (2003) is not applied to Petitioner, where the defendant in that case received the same relief Petitioner requests here, and that case had the same underlying facts.

Respondent filed an answer to the petition (docket #32), stating that the grounds should be denied because they are meritless and/or are procedurally barred. Upon review and applying the AEDPA standards, I find that Grounds I - XI are each without merit and/or are procedurally barred. Accordingly, I recommend that the petition be denied.

---

[1] In his Amendment of Grounds, Petitioner attempts to buttress Ground II by alleging for the first time an "extensive cover-up by the prosecution" with regard to the parking lot surveillance tape. Pet'r Br. in Supp. of Am. Pet. at 14-22 (docket #20). He similarly attempts to supplement Ground V with additional argument under MICH. R. EVID. 404. Pet'r Br. in Supp. Of Am. Pet. at 22-25. These added arguments are not brand-new claims and therefore will not be addressed separately from the discussion of Grounds II and V. In his Amendment to Ground II, Petitioner does add a brand-new argument that his trial counsel was ineffective because he failed to properly impeach prosecution witnesses regarding the videotape of the parking lot surveillance camera. Pet'r Br. in Supp. of Am. Pet. at 19. This new claim is addressed in the discussion of Ground II, below.

**Procedural History**

**A.  Trial Court Proceedings**

The state prosecution arose from a 1994 theft at a Battle Creek Meijer store. Petitioner, Eric Williams, and Russell Williams (no relation to Eric) entered the store. Eric Williams took a pair of boots from a shelf and put them on, and the three left the store without paying for the boots. (Prelim. Exam. Tr., 57-58, docket #38.)  When Meijer security officers approached them in the parking lot, Petitioner pointed a gun at one of the security officers' heads; Eric Williams then grabbed the gun from Petitioner and shot at the three security officers before all three fled. (Prelim. Exam. Tr., 58-60.)

Following the June 29, 1994 preliminary examination, Petitioner was bound over on eleven charges: armed robbery, three counts of felony-firearm, three counts of assault with a dangerous weapon, carrying a concealed weapon, and three counts of aiding and abetting assault with intent to murder. (Prelim. Exam. Tr., 63, 65-68, 70.)  Although the prosecution originally charged Petitioner with aiding and abetting an armed robbery, the court found that there was probable cause to charge him directly with armed robbery, because "the weapon was used [by Petitioner] to keep [Meijer personnel] from recovering their property." (Prelim. Exam. Tr., 64.)

At a September 12, 1994 pre-trial hearing, Petitioner's counsel moved, *inter alia*, to quash or dismiss the armed robbery count. (Mot. Tr., 9/12/94, 3-8, docket #39.)  He argued that retail fraud or shoplifting, not armed robbery, was committed when Petitioner and Eric Williams walked out of the Meijer store with the boots; and that Petitioner's brandishment of the gun later in the parking lot was a completely separate crime of assault. (Mot. Tr., 6-7.)  The court ultimately denied Petitioner's motion to quash or dismiss.

At an October 31, 1994 pre-trial hearing, Petitioner's counsel moved to dismiss all counts. (Mot. Tr., 10/31/94, 3-5, docket #40.)  Counsel based his motion on the fact that Meijer security videotapes that recorded both the inside and outside of the store on the date of the incident had never been produced to the defense. (Mot. Tr., 3-5.)  He further argued that Battle Creek Police Officer Dingman unilaterally decided the recording from outside the store had no evidentiary value and never seized it; which amounted to an intentional misplacement or destruction of evidence crucial to the defense. (Mot. Tr., 3-5.)  Pursuant to Meijer policy, the tape had been erased. (Mot. Tr., 4.)  In response, the prosecution argued that: (1) there was no evidence of bad faith on the part of Dingman, because he had simply viewed the videotape and determined that the parking lot incident had not been recorded on the tape; (2) there was no evidence that the videotape was necessarily exculpatory; and (3) the tape was erased or destroyed in May 1994, months before the court entered its September 1994 order for production.  (Mot. Tr., 5-6.)  The court denied Petitioner's motion to dismiss because there was no evidence that: (1) Dingman had acted in bad faith, (2) the tape was exculpatory, or (3) the tape was destroyed after the entry of court's discovery order. (Mot. Tr., 7-8.)  The court pointed out that "investigating officers make that call every day . . . [between] things, items, physical items, evidence that they believe may be of some evidentiary value, either inculpatory or exculpatory, [and] that which is not of any evidentiary value." (Mot. Tr., 8.)

At the October 31 pretrial hearing, the prosecution moved to endorse Russell Williams, Brett Schiebner, and Curt Meister as witnesses. (Mot. Tr., 10/31/94, 3, 8-9, docket #40.) Counsel for Petitioner objected to the addition of Russell Williams as a witness, or in the alternative, requested a copy of any statements Russell Williams had made to investigators. (Mot. Tr., 10-11.)

The court granted the motion to endorse and ordered production of any statements and/or criminal histories.  (Mot. Tr., 11.)

Petitioner was individually tried before a jury from November 30, 1994 to December 2, 1994.  In its opening argument, the prosecution clarified that it was trying Petitioner on nine counts: armed robbery, three counts of assault with intent to murder, four counts of felony-firearm, and carrying a concealed weapon.  (Tr. I, 17.)

Brett Schiebner testified as follows.  On May 21, 1994, he was in Battle Creek to attend a National Guard drill weekend at Fort Custer.  (Tr. I, 33.)  At about 1:40 a.m. on May 21, he and two men from his platoon, Curt Meister and Larry Lyons, went to the Battle Creek Meijer for snacks.  (Tr. I, 34.)  As he walked into the store, Schiebner passed Petitioner.  (Tr. I, 36.)[2] Witnesses Meister and Lyons testified that after passing Petitioner in the store entrance, Schiebner, Meister, and Lyons followed three Meijer security guards back out into the parking lot to watch the events of a possible shoplifting unfold.  (Tr. I, 57, 59, 76-77.)

Schiebner testified that in the parking lot he saw one of the security guards say something to Petitioner; then Petitioner took a step forward, flung his arms, and pulled a gun from under or in his coat.  (Tr. I, 40.)  Petitioner pointed the gun within two feet of the guard's face, and said something derogatory to the guard, who put his hands up and froze. (Tr. I, 40-42.)  The two other security guards took cover.  (Tr. I, 42.)  One of the other two defendants said something like "give it to me and I'll do it."  (Tr. I, 42.)  Petitioner then stepped back and handed the gun to one of his co-defendants, still pointing it at the security guard.  (Tr. I, 42-43.)  The co-defendant "lunged" forward to take the gun from Petitioner.   (Tr. I, 44.)  At that point, the security guard who had the

---

[2]Pages 37-39 are missing from Trial Transcript I.

gun pointed in his face ran between cars in the lot.  (Tr. I, 42.)  Immediately upon getting the gun

from Petitioner, co-defendant shot once at the security guard, who was now diving behind a car.

(Tr. I, 43.)  The co-defendant then turned around toward the store and "sprayed" two or three more

rounds at Schiebner and another security guard.  (Tr. I, 43-44.)  Schiebner believed four shots total

were fired.  (Tr. I, 43.)  Petitioner took off running; Schiebner jumped behind a store pillar.  (Tr. I,

44.)  Petitioner and the shooter then jumped into a car, which sped away.   (Tr. I, 44.)

Curt Meister testified as follows.  He attended the National Guard drill in Battle

Creek on May 21, 1994 with Schiebner and Lyons.  (Tr. I, 57.)  As the three Guardsmen entered

Meijer, Meister saw a former National Guardsman he knew named Ritter.  (Tr. I, 57.)  Meister also

saw Petitioner and a black male as he entered the store.  (Tr. I, 58.)  Meister greeted Ritter; then

Schiebner, Meister, and Lyons followed Ritter out of the store to watch what Meister believed to be

a shoplifting or security problem; Meister stood aside a store pillar. (Tr. I, 57-60.) Petitioner pulled

a gun from his hip area and held it about one to one-and-a-half feet from a security guard's head,

so Meister sought cover.  (Tr. I, 60-62.)  Meister could not recall whether Petitioner chambered a

round as he held the gun to the security guard's head.  (Tr. I, 61-62.)  Petitioner's friend said he'd

"do it," then "grabbed" the gun; the security guard ducked behind a car during the exchange.  (Tr.

I, 62-63.)  Petitioner "handed" the gun to his friend, who "took" the gun from Petitioner; and that

the exchange was a "pass" from one person to the other.  (Tr. I, 60-61, 63.)  Petitioner's friend

immediately shot once at the security guard, then turned and "sprayed" shots toward Meister,

Schiebner, and Lyons.  (Tr. I, 61, 63, 64.)  Petitioner and his friend then jumped into a car, which

sped off.  (Tr. I, 65.)

Larry Lyons testified as follows.  As Lyons walked into Meijer with Schiebner and

Meister in the early morning of May 21, 1994, he saw two white men and one black man walking

out of the store.  (Tr. I, 74-75.)  Three store security guards also came out of the store.  (Tr. I, 75.)

One of them said, "hold on, we [sic] got shoplifters."  (Tr. I, 76.)  Lyons, Schiebner, and Meister

turned around, left the store, and stood by an outside pillar to watch what was going on.  (Tr. I, 77.)

When security approached the shoplifters in the parking lot, one of the white kids pulled a weapon

out from under his jacket in the waist area.  (Tr. I, 78-79.)  Lyons had not seen the weapon when he

saw Petitioner walking out of the store.  (Tr. I, 79.)  Petitioner put the gun in the security guard's

face from a few feet away, but "couldn't do it so he gave [the gun] to the black kid" by holding the

gun out to him.  (Tr. I, 79.)  By that time, the security guard had taken cover behind a car.  (Tr. I,

79.)  Petitioner had pointed the gun at the security guard for a "few seconds" or a "few minutes."

(Tr. I, 80.)  Petitioner "gave" the gun to the black male, who "grabbed" it.  (Tr. I, 80.)  There was

no struggle in the transfer of the gun.  (Tr. I, 82.)  The gun stayed pointed at the security guard when

it exchanged hands.  (Tr. I, 80.)  At the time the weapon was exchanged, everyone at the scene

"went to find something to hide behind."  (Tr. I, 83.)  Lyons was scared.  (Tr. I, 82.)  The black male

shot a couple of rounds, including one at the rear window of a car, and a "couple" toward Lyons,

Schiebner, and Meister.  (Tr. I, 83.)  The shoplifters then jumped into a car and took off out of the

parking lot.  (Tr. I, 83.)

   William Polokovich testified as follows.  He worked as an undercover store security

guard for the Battle Creek Meijer with Todd Ritter and Scott Silverman on May 21, 1994.  (Tr. I,

95-96.)  At 1:30 a.m. on May 21, he observed one black male and two white males in the store's

shoe department.  (Tr. I, 97-98.)  At trial, Polokovich identified Petitioner as one of the two white

males he saw that night.  (Tr. I, 98-99.)  While peering around a corner 15-20 feet away, Polokovich

saw the black male remove his tennis shoes, take a pair of boots out of their box on the store shelf,

put the boots on, and conceal his tennis shoes under his coat.  (Tr. I, 99-100, 102.)  The three men

then left the shoe aisle.  (Tr. I, 99, 102.)  Polokovich alerted Ritter and Silverman of what he had

seen.  (Tr. I, 104.)  At the time the black male was putting on the boots, Petitioner stood right next

to him, looking around.  (Tr. I, 100-101.)  Polokovich perceived Petitioner's behavior as that of a

possible shoplifter or a "lookout."  (Tr. I, 101.)  Polokovich radioed Ritter and Silverman asking

whether they had seen the three men.  (Tr. I, 104.)  Per the other officers' response, Polokovich ran

to the store's east exit and went outside, where he found one white perpetrator, one black

perpetrator, Ritter, and Silverman.  (Tr. I, 105.)

Polokovich followed the three men into the parking lot, explaining that he was from

Meijer loss prevention and that he wanted to talk to them.  (Tr. I, 106.)  The black male then stated

"if he steps up on us, break a cap in his ass."  (Tr. I, 106-07.)  At that moment, Petitioner produced

a hand gun from inside his jacket and pointed it at Silverman from about two to four feet away.

(Tr. I, 107-08, 109.)  Polokovich shouted "gun" and sought cover behind a vehicle three to five car

aisles away from Petitioner.  (Tr. I, 109-110, 111.)  From behind the vehicle, Polokovich then saw

Petitioner chamber a round into the gun while holding it two feet from Silverman's head.  (Tr. I,

109, 112.)  Petitioner pointed the gun at Silverman for about ten to twenty seconds.  (Tr. I, 111.)

Petitioner and the black male, Eric Williams, began stepping toward each other, Petitioner still

pointing the gun at Silverman.   (Tr. I, 112-13.)   Williams said to Petitioner, "break this

motherfucker."  (Tr. I, 114.)  From 10-15 fifteen feet away from Silverman, Williams "reached over

and took the gun."  (Tr. I, 112-13.)  Williams did not "grab" the gun; rather, it was "kind of a hand

off."  (Tr. I, 113.)  Petitioner's hand moved to pass the gun to Williams.  (Tr. I, 115.)  At the point

of exchange, the gun remained pointed at Silverman.  (Tr. I, 114.)

Polokovich further testified that at the moment the gun was exchanged, Silverman

ducked behind a vehicle.  (Tr. I, 116-17.)  Eric Williams traced Silverman's movement from the

- 9 -

other side of the vehicle and shot once at Silverman through the car's window.  (Tr. I, 117.)  Eric Williams next pointed the gun at Ritter by the pillar and fired one shot, then pointed the gun at Polokovich and fired two shots.  (Tr. I, 117-19.)  Petitioner and Eric Williams then got into a car driven by a third person and sped out of the parking lot.  (Tr. I, 120.)  Polokovich and Silverman accompanied police to identify the vehicle a few blocks away, an apartment complex.  (Tr. I, 120-21.)

Polokovich further testified that there were cameras inside the store, and also three cameras outside the store that automatically panned back and forth, stopping for five-to ten-second intervals.  (Tr. I, 121-22.)  One of the parking lot cameras would have caught the events of May 21, but Polokovich did not review the camera's videotape to determine whether the event was captured.  (Tr. I, 144.)  He believed that a police officer viewed the tape with a store employee, and that the officer had determined nothing was on the tape.  (Tr. I, 144-45.)  Tapes that are not seized by the police are erased by Meijer within two weeks.  (Tr. I, 145.)

Todd Ritter testified that on May 21, 1994, he was working as a loss prevention store detective at the Battle Creek Meijer store with Polokovich and Silverman.  (Tr. I, 149-150.)  At about 1:30 a.m. on May 21, Polokovich radioed Ritter and Silverman regarding two people in the store; in response Ritter and Silverman went to the monitor room and pulled up the shoe department on the camera system.  (Tr. I, 150-51.)  At trial, Ritter identified the videotape that was in the machine, and that he had viewed on May 21.  (Tr. I, 151-55.)  Ritter and Silverman observed one black and two white males in the shoe department.  (Tr. I, 157.)  Ritter and Silverman left the monitor room after they watched Eric Williams[3] take a pair of boots out of a box, put them on,

---

[3] Once in his testimony, Ritter apparently inadvertently stated that Russell Williams was the black male who took the boots, put them on, and hid his own shoes under his coat.  (Tr. I, 158.)

conceal his own shoes in his coat, and leave the shoe department.  (Tr. I, 156, 158.)  At trial, Ritter

identified Petitioner as one of the three men he saw in the shoe department.  (Tr. I, 157.)  Upon

leaving the shoe department, Russell Williams went in a different direction than Petitioner and Eric

Williams.  (Tr. I, 158.)  Ritter and Silverman then radioed Polokovich as Petitioner and Eric

Williams went to the liquor department, then exited the store through the east entrance.  (Tr. I, 163-

64.)  Polokovich, Ritter, and Silverman followed Petitioner and Eric Williams out into the parking

lot from a distance of about eight feet.  (Tr. I, 164.)  Polokovich identified himself as Meijer Loss

Prevention and told Eric Williams that he needed to talk about the boots Williams was wearing.  (Tr.

I, 164.)  Eric Williams said to Petitioner, "if he steps up on me, put a cap in his ass."  (Tr. I, 165.)

Petitioner then pulled a hand gun out of his jacket.  (Tr. I, 166.)  Ritter could not see Petitioner's

front, but saw Petitioner's left side and back, and then saw Petitioner turn with a hand gun in his

right hand.  (Tr. I, 166-67.)  Petitioner pointed the gun directly at Silverman's head starting from

four to six feet from Silverman, then took a couple of lunging steps toward Silverman to within two

feet of Silverman's face.  (Tr. I, 167.)  While lunging, Petitioner pulled back the slide on the gun and

released it.  (Tr. I, 169.)  As soon as Petitioner started to turn with the gun, Polokovich yelled "gun";

Ritter and Polokovich both headed for cover, Ritter to a pillar in the front of the building.  (Tr. I,

168.)  On his way to the pillar, Ritter looked back and saw Silverman still standing with the gun

pointed at his face, where it stayed pointed for about one to two minutes.  (Tr. I, 168, 170.)  Eric

Williams started to scream, "break this motherfucker."  (Tr. I, 169.)  Petitioner then started to back

up, putting a car between himself and Silverman, and Eric Williams "went at the gun with both

hands"; then Petitioner turned a few inches, and, still pointing the gun at Silverman, exchanged the

gun with Eric Williams, who then began to fire.  (Tr. I, 169-171.)

Eric Williams shot at Silverman once through a window of the car Silverman hid behind.  (Tr. I, 172-73.)  Eric Williams then shot once toward the store where Ritter was standing.  (Tr. I, 173-74.)  Ritter crouched behind a car, then watched Eric Williams turn and point the gun at the car Polokovich was hiding behind and fire two more rounds.  (I, 174-75.)  Petitioner and Eric Williams then jumped into a car that pulled up behind them and sped out of the parking lot.  (Tr. I, 175.)  The driver of the car was the third person Ritter had seen earlier in the store vestibule.  (Tr. I, 172.)   At trial, Ritter verified that a number of photographs shown to him were accurate representations of the scene.  (Tr. I, 176-78.)  Ritter then verified that two videotapes were accurate representations of the video surveillance footage taken of the scene on May 21.  (Tr. I, 178-79.)  At trial, Ritter identified a videotape of the store's east entrance that showed the three men entering the store, and the three security officers following them out of the store some time later.  (Tr. I, 160.)  Ritter had viewed the tape on May 21.  (Tr. I, 160-61.)

Over Petitioner's objections, the trial court admitted the two videotapes taken inside Meijer on the night of the incident.  (Tr. I, 178-79.)  The videotape of the east entrance was played in the courtroom.  (Tr I, 179.)  Ritter testified that he recognized Petitioner, Eric Williams, and Russell Williams on the tape of the east entrance.  (Tr. I, 179-180.)  The videotape of the shoe department was then played in the courtroom.  (Tr. I, 181.)  Ritter testified that he recognized Petitioner, Eric Williams, and Russell Williams on the tape of the shoe department.  (Tr. I, 181.)  Ritter had viewed the videotape of the parking lot area near the east entrance, but the incident did not appear on the tape because the camera was pointed in the wrong direction.  (Tr. I, 193-94.)

Scott Silverman testified as follows.  On May 21, 1994, he was employed as a loss prevention detective at the Battle Creek Meijer.  (Tr. I, 196.)  Around 1:30 a.m., Polkovich radioed Silverman and Ritter to report two white males and one black male in the shoe department and that

the black male might be about to conceal a pair of shoes.  (Tr. I, 196-97.)  Silverman and Ritter watched Petitioner and the other two males in the shoe department via closed-circuit in-store television.  (Tr. I, 197.)  Silverman saw the black male conceal a pair of white tennis shoes in his jacket, put on a pair of black boots, lace them up, and walk toward the front of the store.  (Tr. I, 197-98.)  After the men were in the liquor department for a few minutes, they went out the east entrance. (Tr. I, 199.)  Silverman and Ritter radioed Polokovich that two of the men were leaving; then met up with Polokovich at the east doors and went out into the parking lot with him.  (Tr. I, 199.)

When they met up with Petitioner and the black male, Polokovich identified himself and asked to discuss some merchandise.  (Tr. I, 199.)  Silverman observed the boots on Eric Williams' feet.  (Tr. I, 199.)  At trial, Silverman identified Petitioner as one of the two white men present in the parking lot.  (Tr. I, 200.)  In response to Polokovich, Eric Williams looked at Petitioner and said, "If he steps up on me, bust a cap in his ass."  (Tr. I, 201.)  Petitioner then reached into his coat and produced a pistol.  (Tr. I, 201, 202.)  Ritter shouted "gun."  (Tr. I, 202.)  Petitioner pointed the gun at Silverman's head, chambered a round into it, then pointed it at Silverman's face; Silverman was looking down the barrel of the gun.  (Tr. I, 201, 203.)  While pointing the gun at Silverman, Petitioner stood at an angle from him; about five to six feet away.  (Tr. I, 201-03.) Petitioner and Eric Williams then started backing up into the parking lot, Petitioner still pointing the gun at Silverman, his arm at shoulder level.  (Tr. I, 204-05.)  Silverman continued to stand facing Petitioner; he did not want to turn and run for fear of being shot in the back.  (Tr. I, 205-06.)  When Petitioner and Eric Williams had backed away to about ten feet from him, Silverman started taking cover behind a car in front of him.  (Tr. I, 206.)  Eric Williams said, "Break the motherfucker," which Silverman interpreted as an instruction to shoot him.  (Tr. I, 206.)  Silverman crouched behind the car and looked through the passenger side front door window through the car's back window.

(Tr. I, 206.)  He watched Petitioner "pass the gun off to Williams."  (Tr. I, 206.)  Petitioner had his arm out, down slightly by his side, and Eric Williams came up and took the gun.  (Tr. I, 207.)  Silverman saw Eric Williams look down at him through the car window and fire one shot, shattering the rear window of the car.  (Tr. I, 207.)  Silverman then crouched all the way down, taking cover behind the car door, and heard three more shots.  (Tr. I, 208.)  When the shots finished, Silverman looked up and saw a car door close and the car quickly leave the parking lot.  (Tr. I, 208.)  Silverman described the car to police and went to 24th Street with them to identify it.  (Tr. I, 209.)

Battle Creek Police Mobile Evidence Technician Todd Rathjen took photographs in the parking lot; at trial he identified five photos he had taken at the scene.  (Tr. I, 218-19.)  Rathjen found three Remington small-caliber spent shell cartridge casings in the parking lot.  (Tr. I, 219-220.)  Rathjen also collected three videotapes from Silverman: two showing the store's east entrance, and one showing the shoe department.  (Tr. I, 220-21.)  Rathjen did not seize any videotapes recorded by the outside cameras because he was "advised that there wasn't any or that there wasn't anything shown on the outside video."  (Tr. I, 221.)  Rathjen did not himself view the tapes.  (Tr. I, 221.)

Battle Creek Police Officer Craig Dingman testified that on May 21, 1994, he was dispatched to the Battle Creek Meijer store because a shoplifter was being pursued in the parking lot; en route, Dingman heard reports that shots were fired.  (Tr. I, 223-24.)  Dingman was the first officer on the scene.  (Tr. I, 224.)  A number of security people and civilians told Dingman that the suspects had just fled in a car after shooting at the security officers.  (Tr. I, 224.)  They showed Dingman the shell casings in the parking lot and the cars that had been hit by gunshots.  (Tr. I, 224-25.)  Dingman posted "BOL" (be on the lookout) on the vehicle and the suspects, two white males and a black male.  (Tr. I, 225.)  Dingman took the statements of Silverman, Polokovich, Ritter,

Schiebner, Meister, and Lyons.  (Tr. I, 225.)  Soon after he left the scene, Dingman found Russell

Williams at the Drumstick Restaurant, arrested him, and took a statement from him.  (Tr. I, 226.)

        Dingman further testified that while at Meijer he viewed videotape from the outside

camera to determine whether it had recorded the parking lot incident.  (Tr. I, 226-27.)  On the tape,

Dingman saw:

> [n]othing that was distinguishable during the time period of the
> incident, the camera was either taping the wrong area or the darkened
> lighting, but all you could see was vehicles coming and going and
> people moving, but it was such a dark video, you couldn't recognize
> or distinguish anybody, nothing that looked like it had anything to do
> with the incident.  (Tr. I, 227.)

        On cross-examination, Officer Dingman testified that the outside cameras span the

parking lot 24 hours a day.  (Tr. I, 228.)  There was something on the tape, but it didn't appear to

be in the right area.  (Tr. I, 228.)  He further explained        :

> [t]he problem with that camera is it pans . . . it doesn't pan in a
> predictable manner either so that a suspect . . . can't predict where the
> camera's going to be.  It stutters.  And it just didn't appear it was at
> the right spot at the right time.  The filming was just so dark, you
> couldn't recognize any people or vehicles anyhow. (Tr. I, 228.)

Dingman stated that it was difficult to determine where the outside camera was pointing; it could

have been pointing at the parking lot incident, or the back of the building, or somewhere else.  (Tr. I,

228.)  He could see forms on the tape that he knew were people, and vehicles coming or going, but

the images were dark.  (Tr. I, 228-29.)  He stated, "[i]t didn't have anything involved in the incident

I was investigating."  (Tr. I, 229.)  Dingman left the outside tape at Meijer.  (Tr. I, 229.)

        Battle Creek Police Officer Fred Cummins testified that on May 21, 1994, he was

called to assist in the execution of a search warrant at 24 West Rittenhouse in Battle Creek.  (Tr. I,

233-34.)  While executing the warrant, Cummins seized a pair of boots that were in plain view on the floor.  (Tr. I, 234.)

At the conclusion of the first day of trial, the court instructed the jury that there would undoubtedly be news accounts of the May 21 incidents, but that they were not to read, listen to, or watch any news accounts relating to the case.  (Tr. I, 236.)  The court also admonished the jury not to discuss the case with anyone.  (Tr. I, 237.)

Battle Creek Police Detective David Adams testified that at 6:30 a.m. on May 21, 1994, he was called to act as lead investigator on a robbery and assault that had occurred at the Battle Creek Meijer store.  (Trial Tr. vol. II, 12/1/94, 3-4, 6, docket #42.)  Adams spoke with the original reporting officers and co-defendant Russell Williams, from whom he took a statement.  (Tr. II, 6-7.)  As a result of the statement by Russell Williams, Adams went looking for other suspects at 24 West Rittenhouse and 57 South 24th Street.  (Tr. II, 7.)  Adams and an Officer Riviera went to the Rittenhouse address and located Eric Williams, who they arrested.  (Tr. II, 7-8.)  Adams was present when Officer Cummins seized a pair of black boots from that location.  (Tr. II, 8.)  Adams then spoke with Petitioner's sister, Carrie O'Donnell, at the 24th Street address.  (Tr. II, 8-9.)  Petitioner was picked up 2 blocks away by a Sergeant Vanderbilt.  (Tr. II, 9.)  Adams told Petitioner he was under arrest for armed robbery and attempted murder, and placed him in handcuffs.  (Tr. II, 9.)

On either May 21 or May 22, Detective Adams interviewed Petitioner at the police station.  (Tr. II, 9-10.)  Prior to the interview, Adams read Petitioner his Miranda[4] rights and a standard waiver form in its entirety.  (Tr. II, 10-11.)  Petitioner then reviewed and signed the form.

---

[4]*Miranda v. Arizona*, 384 U.S. 436 (1966).

(Tr. II, 11.)  Adams asked Petitioner to explain in his own words what happened at Meijer.  (Tr. II, 13-14.)  Petitioner relayed the events of May 20-21 to Adams as follows.  Eric Williams and Russell Williams went to Petitioner's apartment at 24th Street; at some point during the visit, a decision was made to go to Meijer to buy some gin.  (Tr. II, 14.)  The three entered the store from the east entrance.  (Tr. II, 14.)  Russell Williams wanted to go to the shoe department, so they all went.  (Tr. II, 14.)  Eric Williams took off his tennis shoes and put on a pair of black boots.  (Tr. II, 14-15.)  As Eric put the boots on, Russell left the store.  (Tr. II, 15.)  Petitioner and Eric Williams then went to the liquor department and Eric put a bottle of gin in his pants.  (Tr. II, 15.)  Petitioner and Eric Williams left the store, and were approached by store detectives just outside the east entrance.  (Tr. II, 15-16.)  Eric Williams said something to Petitioner to the effect of "pop him."  (Tr. II, 16.)  Petitioner pulled a gun from under his coat and pointed it at the store detectives.  (Tr. II, 16.)  Two of the store detectives ran for cover; one just stood there.  (Tr. II, 16.)  Eric Williams asked Petitioner for the gun and Petitioner handed the gun over to him.  (Tr. II, 16.)  After handing the gun to Eric Williams, Petitioner ran to the car being driven by Russell Williams and jumped in the back seat, followed by Eric Williams.  (Tr. II, 16-17.)  As the car drove away, Eric Williams leaned out the window and fired shots at the security detectives.  (Tr. II, 17.)  They returned to Petitioner's apartment at 24th Street, where they listened to a police scan and talked to Petitioner's sister Carrie O'Donnell about what had happened at Meijer.  (Tr. II, 18.)  All Petitioner knew before they went to Meijer was that they were going to get gin.  (Tr. II, 19.)  Petitioner was carrying a gun while riding to Meijer, and had considered leaving the gun in the car, but decided to take it into the store with him concealed on his person.  (Tr. II, 19.)  At trial, Adams verified that a copy of the transcript of his interview with Petitioner was accurate.  (Tr. II, 20.)  The prosecutor moved to admit the

transcript; Petitioner's counsel did not object on the condition that certain deletions were made first. (Tr. II, 20.)

Adams further testified that six months later, on November 15, 1994, he was asked to join the Calhoun County Sheriff's Department task force to try to find four jail escapees, one of whom was Petitioner. (Tr. II, 20-21.) For sixteen hours a day for five days, Adams helped look for Petitioner. (Tr. II, 22.) Adams, a Detective Hurtt, and a Trooper Wimbley were all present when Petitioner was apprehended in Freemont, Indiana, about one hour from Battle Creek. (Tr. II, 21.) At this point in Adams' testimony, Petitioner's counsel objected to the testimony on relevance grounds. (Tr. II, 22.) He pointed out that the court had previously ruled on the escape issue, and that the details of the hunt for Petitioner were irrelevant. (Tr. II, 22.) The prosecutor argued in response that it was relevant that the search took a substantial amount of time, and that it was a complex investigation that required considerable manpower; facts the jury should be allowed to consider. (Tr. II, 22-23.) The court ruled that the prosecution could proceed on generalized terms of the escape; and that it would soon instruct the jury on the issue. (Tr. II, 23.) Adams then testified that nine people were assigned to the search task force, aided by other out-of-state and Calhoun County agencies. (Tr. II, 23.)

Before Petitioner's cross-examination of Adams, the court instructed the jury on the jail escape evidence:

> [T]his evidence concerning the escape does not prove guilt. A person may escape for many reasons, like panic or fear or mistake or whatever. However, a person may also escape jail and run and hide because of a consciousness of guilt. You have to decide whether the evidence is true concerning this escape; and if it is true, whether it shows that [Petitioner] had a guilty state of mind. (Tr. II, 23-24.)

Adams further testified regarding Petitioner's statement to him as follows.  It was the idea of Eric Williams and Russell Williams to get gin.  (Tr. II, 25, 28.)  It was Russell Williams' idea to go to the Meijer shoe department.  (Tr. II, 25.)  There was no conversation about stealing shoes or liquor between Petitioner, Russell Williams, and/or Eric Williams prior to their entering Meijer.  (Tr. II, 28.)  Eric Williams' only statement to Petitioner in the parking lot was something to the effect of "Ben, pop him."  (Tr. II, 26.)

Russell Williams, 18, testified that he'd known Eric Williams for six to eight months, and had only met Petitioner three or four times.  (Tr. II, 32-33.)  Russell Williams identified Petitioner as defendant Benjamin O'Donnell and testified as follows.  (Tr. II, 33-34.)  In exchange for his cooperation with the prosecution, Russell Williams had received a plea agreement to a charge of accessory after the fact and received probation.  (Tr. II, 34.)  On May 20, 1994, Russell Williams and Eric Williams met at Eric Williams' house on Rittenhouse Street and then proceeded to Petitioner's apartment on 24th Street, arriving there at about 6:00 p.m.  (Tr. II, 34-35, 36.)  Eric Williams and Petitioner wanted to have a party and left; Russell Williams stayed behind at the apartment, smoked a joint with an Alfonzo Taylor, and fell asleep.  (Tr. II, 35.)  Petitioner's sister Carrie O'Donnell and her sister were in the apartment the entire time.  (Tr. II, 35-36.)  An hour and a half after Russell Williams smoked the joint, Petitioner and Eric Williams returned to the apartment.  (Tr. II, 36.)  Twenty minutes later, Petitioner, Russell Williams, and Eric Williams left the apartment together in Russell Williams' car to get some gin at Meijer.  (Tr. II, 36-38.)  It was Eric Williams's idea to get the gin.  (Tr. II, 38.)  Russell Williams did not see any weapons in the car en route to Meijer.  (Tr. II, 38-39.)  He knew Petitioner had a gun, but did not know Petitioner had it with him at the time.  (Tr. II, 39-40.)

The three men entered the store through the east entrance as other shoppers entered and exited; Eric Williams and Petitioner then went to the boot department.  (Tr. II, 38, 40.)  It was Eric Williams' idea to go to the boot department; Russell Williams just followed him.  (Tr. II, 40.)  Eric Williams looked at a few different pairs of boots and tried them on.  (Tr. II, 40-41.)  Russell grew tired of standing there, told the others he was going outside to smoke a cigarette, and went out to his car.  (Tr. II, 41.)  At the time Russell left, Eric was in the process of putting boots on and had not indicated to Russell what he was going to do with the boots.  (Tr. II, 41.)

From his car, Russell Williams saw Eric Williams and Petitioner leave Meijer, though his view was somewhat obstructed by other cars in the parking lot.  (Tr. II, 43.)  Eric Williams and Petitioner walked toward Russell Williams' car; when they were 20-25 feet away from Russell's car, three other guys came out of the store after them.  (Tr. II., 43-44.)  To Russell, it appeared something had happened in the store "like somebody was running their mouth or something."  (Tr. II, 44.)  Russell saw Petitioner pull out a gun from the front pouch of his jacket and the five of them stood there arguing for a minute or so; Russell could not hear what they were saying.  (Tr. II, 44-45.)  Petitioner cocked the gun and held it about three inches from one of the guys' head.  (Tr. II, 45-46.)  Eric Williams was two feet to Petitioner's right.  (Tr. II, 46.)  Eric or Petitioner stood at the door of Russell's car; at this time Eric was holding the gun, pointing it toward the store.  (Tr. II, 48-50.)  Russell did not see how Eric Williams got the gun.  (Tr. II, 49.)  Petitioner and Eric Williams were in the doorway of Russell's car when Russell heard Petitioner say, "he's behind the car"; then heard a shot.  (Tr. II, 50.)  Russell did not see where the gun was pointed at that moment, but heard and saw glass breaking in a car next to his.  (Tr. II, 51.)  Russell did not know what was going on, and the "[n]ext thing I know they're in my car."  (Tr. II, 47, 52.)  Russell heard three more shots and knew they were coming from right inside his car door.  (Tr. II, 52.)  Eric jumped in the back seat,

- 20 -

threw a bottle of gin in the front seat, and shouted to Russell that if he didn't get moving, he'd "bust a cap in [Russell's] ass."  (Tr. II, 52-53)

Russell drove to Petitioner's apartment on 24th Street.  (Tr. II, 54.)  In Russell's car, Eric took off the boots.  (Tr. II, 54.)  Carrie O'Donnell, her little sister, Russell, Eric, and Petitioner were at the apartment.  (Tr. II, 55.)  They wanted Russell to drive the car to the back; so he did.  (Tr. II, 55.)  They all then listened to a police scanner in the apartment.  (Tr. II, 55.)  Eric and Petitioner were "playing" with the gun like it was a toy, "messing around with it."  (Tr. II, 55.)  Russell wanted to leave; Petitioner told him that he'd shoot Russell if he tried to leave.  (Tr. II, 56.)  Eric and Petitioner joked and laughed about how "funny" it looked when Petitioner put the gun to the security guard's head.  (Tr. II, 58-59.)  Ten to fifteen minutes later, the police arrived.  (Tr. II, 56, 59.)  Petitioner said if the police came into his apartment, he'd "have to drop one of them"; Eric Williams said something similar.  (Tr. II, 59-60.)  Russell left Petitioner's apartment and was arrested twenty minutes later.  (Tr. II, 60.)  On direct examination, the prosecution asked Russell Williams whether Petitioner's family had threatened him regarding his testimony; Russell responded, "yes."  (Tr. II, 61.)  Petitioner's counsel objected and the court struck the question and answer, saying, "Not to be considered, there's no response."  (Tr. II, 61.)

On cross-examination, Petitioner's counsel referenced Russell Williams' "sweetheart deal" with the prosecution; when counsel asked Russell whether he testified against Petitioner merely as a "good-natured citizen," Russell responded, "no."  (Tr. II, 61.)  Russell admitted that he did not like being in jail, and that he had originally been charged with armed robbery, a serious offense that entailed jail time, before the prosecution offered him a plea agreement of accessory after the fact and probation.  (Tr. II, 85-86.)

- 21 -

While the jury was in recess, the prosecution made an offer of proof regarding potential testimony from an Officer Hurtt that when Hurtt had approached Petitioner in Indiana, Petitioner told Hurtt his name was "Lawrence."  (Tr. II, 90.)  Petitioner's counsel objected to the testimony as irrelevant because evidence regarding the escape had already been proffered, and what the Petitioner did after the escape "was too far afield."  (Tr. II, 90-91.)  The prosecution responded that Petitioner's use of an alias may have been an attempt to continue his flight and evade capture. (Tr. II, 91-92.)  The court sustained the objection, ruling the testimony was inadmissible, pointing out that it had allowed the escape evidence to come in for a limited, specific purpose under case law, but it would not also allow details beyond the fact of the escape.  (Tr. II, 92.)

After the jury was brought back in, Calhoun County Sheriff's Department Corrections Officer Jill Wolkiewicz testified as follows.  On November 14, 1994, she was assigned to Pod C of the Calhoun County Jail.  (Tr. II, 94.)  When Wolkiewicz did her 4:00 p.m. head count, Petitioner was present in Pod C.  (Tr. II, 95.)  When she conducted her 9:50 p.m. head count, the correct number of inmates were present.  (Tr. II, 96.)  Wolkiewicz was relieved by a Deputy Bradley at midnight.

Calhoun County Sheriff's Department Corrections Officer Jeffrey Bradley testified that he began his shift at Pod C of the jail between 11:45 p.m. and 12:00 midnight.  (Tr. II, 98.)  At 12:05 a.m. on November 15, Bradley did a head count and noticed Petitioner was not in his cell. (Tr. II, 100.)  Three other inmates were also missing.  (Tr. II, 100-01.)  Petitioner did not turn up in a jail-wide search.  (Tr. II, 101.)  A recreation area adjacent to Petitioner's pod was accessible to inmates between morning head count and 10:30 a.m.  (Tr. II, 101-02.)  In his search for Petitioner on November 15, Bradley observed that the ceiling screen of the recreation area had been cut.  (Tr. II, 102.)

Battle Creek Police Detective Timothy Hurtt testified that on November 15, 1994, he assisted the Sheriff's Department in the investigation of Petitioner's jail escape. (Tr. II, 103.) On November 19, 1994, Hurtt and Trooper Eric Wimbley arrested Petitioner in Stuben County, Indiana (Tr. II, 103-04.) Hurtt identified Petitioner as the person he arrested on November 19. (Tr. II, 105.)

After Hurtt's testimony, both the prosecution and the defense rested. (Tr. II, 106.) Before dismissing the jury for the day, the court again admonished them not to read, listen to, or watch any news accounts regarding the case, or to discuss it with anyone. (Tr. II, 107.)

On December 2, 1994, the jury deliberated after closing arguments and instructions. They returned a verdict later that day, finding Petitioner guilty on all counts charged. (Trial Tr. vol. III, 12/2/94, 62-63, docket #43.) On January 6, 1995, Petitioner was sentenced to concurrent terms of 25 to 50 years' imprisonment for each of the assault convictions, 2 years' imprisonment for each of the felony-firearm convictions (to be served concurrent with each other but consecutive to the other sentences), 20 to 40 years' imprisonment for the armed robbery conviction, and 3½ to 5 years' imprisonment for the concealed weapon conviction. (Sentencing Tr., 1/5/95, 27-29, docket #44; J. of Sentence, 1/6/95, docket #49.) On May 4, 1995, Petitioner was sentenced to 1 to 4 years' imprisonment for escaping from the county jail, MICH. COMP. LAWS § 750.197. Pet. at 60; Mich. Dep't of Corr. Offender Tracking Information System.[5]

---

[5]http://www.state.mi.us/mdoc/asp/otis2.asp.

## B.  Procedural History

Petitioner appealed as of right to the Michigan Court of Appeals on January 31, 1995. His first brief, which was filed by counsel on June 3, 1996, raised four issues; only one of which he includes in his eleven grounds for habeas relief.  (*See* Def.-Appellant's Br. on Appeal, vi, docket #45.)  In a September 23, 1996 supplemental brief filed in *pro per*, Petitioner added three additional issues on appeal, each of which he raises in his habeas application.  (*See* Def.-Appellant's Supplemental Br. on Appeal, I, docket #45.)  On March 13, 1998, the court of appeals affirmed five of the seven issues Petitioner raised; and declined to address the remaining two issues because they had not been preserved for appellate review.  (Mich. Ct. App. Op., 3/13/98, 1-3, docket #45.)

On April 17, 1998, Petitioner filed a *pro per* delayed application for leave to appeal in the Michigan Supreme Court.  He raised the same seven issues he had raised in the court of appeals.  (*See* Def.-Appellant's Delayed Pro Per Application for Leave to Appeal, 4/17/98, 2-8, docket #46.)  By order entered on December 30, 1998, the Michigan Supreme Court denied Petitioner's application because it was not persuaded that it should review the questions presented. (Mich. Order, 12/30/98, docket #46.)  Petitioner did not apply for certiorari in the United States Supreme Court.

On September 8, 1999, Petitioner filed his first petition for habeas corpus relief.  *See O'Donnell v. Birkett*, 5:99-cv-106 (W.D. Mich.).   On the date he filed, there were 203 days remaining in the one-year habeas corpus limitations period.  *See* 28 U.S.C. § 2255.  More than 1 ½ years later, the Court dismissed the petition without prejudice for lack of exhaustion of available state-court remedies.  *O'Donnell*, 5:99-cv-106 (W.D. Mich., Mar. 27, 2001.)  Thus, by the time the Court dismissed Petitioner's first habeas application, the one-year limitations period had expired.

1.      Motion for relief from judgment I

On May 30, 2001, Petitioner filed a *pro per* motion for relief from judgment under MICH. CT. R. 6.500 *et seq*. in the Calhoun County Circuit Court in which he raised three issues. (Def.-Appellant's Delayed Application for Leave to Appeal, 12/26/02, 4-5, docket #48.) In a June 6, 2001 order, the circuit court denied Petitioner's requests for appointment of counsel and for an evidentiary hearing.  (Circuit Ct. Order, 6/6/01, docket #36.)  The circuit court apparently did not address any of the substantive issues in Petitioner's motion for relief in its June 6, 2001 order, or in any other judgment or order. Petitioner attempted to amend his motion for relief to add additional issues (Def.-Appellant's Application for Leave to Appeal, 6/3/02, 2, docket #47; Def.-Appellant's Delayed Application for Leave to Appeal, 12/26/02, 6-7, docket #48.)  On February 22, 2002, the circuit court denied his attempts to amend.  (Circuit Ct. Order, 2/28/02, docket #32.)

On June 5, 2002, Petitioner appealed the circuit court's June 6, 2001 and February 22, 2002 rulings to the Michigan Court of Appeals.  (Mich. Ct. App. No. 241856 Docket[6] #1; Def.-Appellant's Application for Leave to Appeal, 6/3/02, 4-5, 26, docket #47.)  In his brief, Petitioner raised the same three issues he had raised in his original motion for relief from judgment, and added ineffective assistance of trial counsel and ineffective assistance of appellate counsel claims.  (Def.-Appellant's Application for Leave to Appeal, 6/3/02, I, 2a, 3b-9b, 26, docket #47.)  For relief, he asked the court of appeals to set aside his convictions and sentences, dismiss all charges with prejudice; or grant him a new trial; or order the circuit court to rule on his motion for relief from judgment after allowing him to supplement the issues raised therein.  (Def.-Appellant's Application for Leave to Appeal, 6/3/02, 26-27, docket #47.)  On June 26, 2002, Petitioner moved the court of

---

[6]The capitalization of "Docket" designates the Michigan Supreme Court or Michigan Court of Appeals docket; the lower-case "docket" designates this Court's docket.

appeals to remand to the trial court under MICH. CT. R. 7.211(C)(1).  (Mich. Ct. App. No. 241856 Docket #9.)  On August 23, 2002, the court of appeals granted Petitioner's motion to waive fees; denied his motion to file an application exceeding the 50-page limit; and denied his motion to file a substitute application for leave to appeal.  (Mich. Ct. App. Order, 8/23/02, docket #47.)  On December 6, 2002, the court of appeals denied Petitioner's motion to remand, and denied his delayed application for leave to appeal based on its finding that Petitioner failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  (Mich. Ct. App. Order, 12/6/02, docket #47.)

On January 2, 2003, Petitioner filed a *pro per* delayed application for leave to appeal in the Michigan Supreme Court.  (Mich. No. 122982 Docket #19; Def.-Appellant's Delayed Application for Leave to Appeal, 01/02/03, docket #48.)  In this appeal, Petitioner challenged both the June 6, 2001 and February 22, 2002 orders entered by the circuit court. He further raised and fully briefed all of the substantive issues he had raised in his motion for relief from judgment.  (Def.-Appellant's Delayed Application for Leave to Appeal, 12/26/02, 8-9, 15, docket #48.)  He argued that the circuit court erred by failing to order the prosecution to respond to the motion for relief from judgment, and by failing to address the substantive issues in that motion.  (*Id*. at 8-11.)  Petitioner asked the supreme court for an order remanding the motion for relief from judgment back to the circuit court to address its substantive issues, or in the alternative, for a "factual finding" on the issues raised in that motion.  (*Id*. at 14.)  On May 30, 2003, the Michigan Supreme Court denied leave because Petitioner had failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  (Mich. Order, 5/30/03, docket #48.)

2.      Present habeas corpus petition and stay

Petitioner signed his present habeas application on June 4, 2003 (docket #1 at 60), only a few days after the Michigan Supreme Court denied his application for leave to appeal the circuit court's June 6, 2001 and February 22, 2002 orders.  The Court received Petitioner's application for filing on June 6, 2003, and ordered Respondent to answer via order entered on July 9, 2003 (docket ##1, 7.)  On August 1, 2003, Petitioner moved the Court for a stay (docket #9) pending his exhaustion of a new claim challenging his armed robbery conviction based on the decisions of *People v. Randolph*, 648 N.W.2d 164 (Mich. 2002)  (rejecting the "transactional approach" to robbery; holding instead that force or violence must be used before or contemporaneously with the taking), and *People v. Scruggs*, 662 N.W.2d 849 (Mich. Ct. App. 2003) (applying *Randolph* to armed robbery, holding that the defendant committed larceny rather than armed robbery because he used a knife to escape, rather than before or during the taking.)  On December 12, 2003, the Court stayed this action on Petitioner's exhausted claims and ordered him to exhaust his state-court remedies on any unexhausted claims (docket #15).

3.      Motion for relief from judgment II

Petitioner next filed a "successive motion" for relief from judgment in the Calhoun County Circuit Court, in June 2004, pursuant to MICH. CT. R. 6.502(G)(2).  (Def.-Appellant's Br. in Support of Delayed Application for Leave to Appeal, 6/17/04, A, docket #49.)  In his motion, Petitioner argued that *Randolph* and *Scruggs* should be applied retroactively to reverse his conviction for armed robbery; and that a failure to do so would entail a violation of Petitioner's Fourteenth Amendment right to equal protection.  (Circuit Ct. Op., 8/15/03, 1; Def.-Appellant's Br. in Support of Delayed Application for Leave to Appeal, 6/17/04, A, both at docket #49.)

On August 15, 2003, the trial court denied Petitioner's motion, finding that *People v. Gay*, 289 N.W.2d 651 (Mich. 1980) mandated against retroactive application of *Randolph* and *Scruggs*; and that the issue was furthermore not a constitutional one. (Circuit Ct. Op., 8/15/03, 1-2, docket #49.) The court invited both parties to file additional briefs regarding the retroactivity of the *Randolph* and *Scruggs* decisions within 28 days. (Circuit Ct. Op., 8/15/03, 2, docket #49.) Petitioner filed a Supporting Case Law/Memoranda in Support of Defendant's "Successive Motion" for Relief from Judgment. (Def.'s Mem., 8/25/03, 1-2, docket #49.)

On September 19, 2003, the circuit court again denied Petitioner's successive motion for relief from judgment because it was not convinced that *Randolph* or *Scruggs* should be retroactively applied to his armed robbery convictions. (Circuit Ct. Order, 9/17/03, docket #49.)

On December 8, 2003, Petitioner requested leave to appeal the circuit court's September 19 order to the Michigan Court of Appeals. (Mich. Ct. App. No. 252567 Docket No. 1.) The court granted leave on March 15, 2004. (Mich. Ct. App. No. 252567 Docket No. 14.) On April 19, 2005, the court of appeals reversed Petitioner's armed robbery conviction and remanded for a retrial on "any and all appropriate lesser charges arising out of the events in question." (Mich. Ct. App. Op. at 2, docket # 49.) The court of appeals based its reversal and remand on its finding that *Randolph* and *Scruggs* did apply retroactively to Petitioner's case, because those decisions clarified existing law rather than overruling uncontradicted law. *Id*.

On May 2, 2005, the prosecution requested leave to appeal the April 19, 2005 court of appeals decision in the Michigan Supreme Court. (Mich. No. 128587 Docket No. 38; Pltf.-Appellant's Application for Leave to Appeal, docket #50.) On September 23, 2005, the supreme court reversed the court of appeals' April 19 judgment, reinstating Petitioner's armed robbery conviction in lieu of granting leave to appeal. (Mich. Op. at 1, docket #50.) The supreme court

reasoned that *Randolph* and *Scruggs* were to be given limited retroactive effect, *i.e.*, applied only to cases pending on appeal, in which the issue was raised and preserved, at the time *Randolph* and *Scruggs* were decided. *Id.* Petitioner did not seek certiorari from the Michigan Supreme Court's September 23, 2005 decision.

### <u>Standard of Review</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state

courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir.

- 30 -

1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to habeas relief.

**Discussion**

### A.  Ground I: Double Jeopardy at Sentencing

As his first ground for habeas corpus, Petitioner maintains that the trial court violated his right to be free from double jeopardy under the Fifth and Fourteenth Amendments when it sentenced him separately for armed robbery and assault with intent to commit murder.  Pet. at 23. He contends that armed robbery is an "included" and "cognate lesser" offense to assault with intent to commit murder; and that his separate sentence for each of the two offenses therefore entails "double punishment" in violation of the double jeopardy clause.  Pet. at 23, 24.  In support of this argument, Petitioner recites scant facts of what appear to be court decisions for which he provides no names or citations.  Pet. at 23-25.  Specifically, Petitioner describes and analogizes cases he contends hold that double jeopardy precludes conviction and/or sentencing for both armed robbery and felony-murder; and armed robbery and receiving the stolen money.  Pet. at 23-24.  Petitioner argues that under a "same transaction" test, his commission of armed robbery and assault with intent to murder were "of a single transaction"; were "committed in a continuous time sequence"; and "displayed a 'single intent and goal.'"  Pet. at 24-25.  Based on this characterization, he argues that he should have been sentenced only for the offense of "robbery."  Pet. at 25.

Petitioner raised Ground I on direct appeal in the Michigan Court of Appeals and in the Michigan Supreme Court.  (Def.-Appellant's Suppl. Br. on Appeal, 9/23/96, I, 14-18, docket #45; Def.-Appellant's Delayed Pro Per Application for Leave to Appeal, 4/17/98, docket #46.) Because Petitioner "fairly present[ed]" this federal claim to both state appellate courts, giving them a "fair opportunity" to apply controlling legal principles to the facts, it is fully exhausted and may

be addressed by this Court.  *See Picard v. Connor*, 404 U.S. 270, 275-77 (1971) (cited by *Duncan*

*v. Henry*, 513 U.S. 364, 365 (1995) and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).

On direct appeal, the Michigan Court of Appeals held as follows on Petitioner's

double jeopardy claim:

> Defendant also argues, in propria persona, that his convictions of both armed
> robbery and assault with intent to commit murder violate the Double Jeopardy
> Clauses of the United States and Michigan Constitutions.  Although defendant failed
> to raise this issue at trial, this Court may consider constitutional claims for the first
> time on appeal.  *People v Zinn*, 217 Mich App 340, 344; 551 NW2d 704 (1996).
> Defendant's argument, however, is without merit because the prohibitions against
> double jeopardy do not bar a defendant's convictions for armed robbery and assault
> with intent to commit murder.  See *People v Harding*, 443 Mich 693; 506 NW2d 482
> (1993).  (Mich. Ct. App. Op., No. 182699, 3, docket #45)

Petitioner does not cite any authority for his position that the Court of Appeals

decision contradicted United States Supreme Court precedent in this holding, nor could he.  In

*People v. Harding*, on which the court of appeals based its decision, the Michigan Supreme Court

applied and followed a number of United States Supreme Court decisions regarding double

jeopardy.  *See* 506 N.W.2d at 486-87.  The *Harding* court noted that offenses which are "distinct

offenses in law and in fact" do not place a defendant in double jeopardy.  506 N.W.2d at 486 (citing

*Diaz v. United States*, 223 U.S. 442 (1912)).  The Michigan Court of Appeals did not run afoul of

*Diaz*, or any other United States Supreme Court precedent, in its determination that convictions for

armed robbery and assault with intent to commit murder do not implicate the proscription on double

jeopardy.  Petitioner is therefore not entitled to habeas relief on Ground I.

### B. Ground II: Denial of Motion to Dismiss Based on Officer's Failure to Seize Videotape; Ineffective Assistance of Trial Counsel for Improper Impeachment Regarding the Videotape

Petitioner next argues that the trial court violated his due process rights when it

denied his pre-trial motion to dismiss all charges against him, which he had based on Officer

Dingman's failure to seize the videotape from the Meijer parking lot camera.  Pet. at 26-27. Petitioner claims that instead of unilaterally deciding that the images and shadows he saw on the tape were of no evidentiary value, Dingman should have seized and produced the tape; Dingman's and the prosecution's failure to do so entailed an intentional suppression of evidence that may have been helpful in determining whether Eric Williams took the gun from Petitioner or Petitioner gave it to Eric Williams during the incident.  Pet. at 26-27.

Petitioner raised this issue on direct appeal to the Michigan Court of Appeals and Michigan Supreme Court.  (Def.-Appellant's Br. on Appeal, 6/3/96, vi, 6-9, docket #45; Def.-Appellant's Delayed Pro Per Application for Leave to Appeal, 4/17/98, docket #46.)  The issue is therefore exhausted and may be addressed by this Court.  The Michigan Court of Appeals held as follows on Petitioner's Ground II videotape suppression claim:

> Defendant first argues that he was denied his due process rights under the United States and Michigan Constitutions where a police officer failed to preserve a videotape of the store parking lot made by a surveillance camera at the time of the crimes.  We disagree. Prior to June 1, 1995, the scope of discovery was in the trial court's discretion, *People v Wimberly*, 384 Mich 62, 69; 179 NW2d 623 (1970), and this Court reviewed the trial court's grant or denial of discovery under the abuse of discretion standard, *People v Lemcool*, 445 Mich 491, 498; 518 NW2d 437 (1994).

> We first note that in the case at bar the police officer's decision to erase the videotape[7] antedated the trial court's September 29, 1994, discovery order by several months.  Thus, this is not a case where the police failed to preserve evidence that had been requested by defendant, or was the subject of a previous discovery order.  Further, a store security officer testified that videotapes such as the instant one are usually erased within two weeks of their creation.  Also, two witnesses, who viewed the videotape, testified that they saw nothing of significance on the videotape.

---

[7]I note from the trial court record that Officer Dingman did not erase the tape; rather, Dingman concluded the tape had no evidentiary value and therefore did not seize or place it into evidence.  (Trial Tr. I, 226-29.)  It is the general policy of Meijer to erase surveillance tapes after a two-week period.  (Mot. Tr., 10/31/94, 4, docket #40; Tr. I, 145.)

> The United States Supreme Court has held that where the state has failed to preserve evidentiary material of which no more can be said than that it could have been subjected to tests the results of which might have exonerated the defendant, the failure to preserve the potentially useful evidence does not constitute a denial of due process unless the criminal defendant can show bad faith on the part of police. *Arizona v Youngblood*, 488 US 51, 58; 109 S Ct 333; 102 L Ed 2d 281 (1988). We find that defendant has not shown bad faith on the part of the police and, thus, has not established that his due process rights were violated. (Mich. Ct. App. Op., 3/13/98, 1-2, docket #45.)

The Michigan Supreme Court denied Petitioner leave to appeal because it was not convinced it should review this issue. (Mich. Order, 12/30/98, docket #46.)

The Court of Appeals decision regarding the videotape was entirely consistent with the Supreme Court precedent in *Arizona v. Youngblood*, 488 US 51 (1988) and therefore does not warrant habeas relief. Although he alleges Officer Dingman made a "deliberate decision" not to seize the tape (Pet. at 27), Petitioner cites no evidence that Dingman acted in bad faith. As the court of appeals pointed out, any alleged bad faith on the part of Dingman is furthermore negated by the fact that the decision not to seize the tape antedated the trial court's discovery order.

In his amendment to Ground II, Petitioner adds a claim that he was denied his Sixth Amendment right to effective assistance of trial counsel because his trial attorney failed to properly impeach prosecution witnesses on their testimony regarding the videotape of the parking lot camera surveillance. Pet'r Br. in Supp. of Am. Pet. at 19 (docket #20). Petitioner maintains that proper impeachment would have revealed that those witnesses all lied about the tape. Pet'r Br. in Supp. of Am. Pet. at 19, 20, 21.

Petitioner's Ground II amendments are unexhausted because they were never raised in the Michigan state courts, and are therefore procedurally defaulted: "If the claims presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but are

procedurally barred." *Cone v. Bell*, 243 F.3d 961, 967 (6th Cir. 2001) (citing *Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991), *rev'd on other grounds*, 535 U.S. 635 (2002)). When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering the issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107, 124-125, 129 (1982). The Sixth Circuit applies a four-part test to determine whether a federal claim is procedurally defaulted in state court: (1) the court must first determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule; (2) the court must decide whether the state courts actually enforced the state procedural rule; (3) the default must be an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim; and (4) if the foregoing are met, the petitioner must demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001), *cert. denied*, 535 U.S. 940 (2002); *Patterson v. Haskins*, 316 F.3d 596, 604 (6th Cir. 2003). A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been apprised of the procedural rule's existence. *Luberda v. Trippett*, 211 F.3d 1004, 1006-07 (6th Cir. 2000).

Although this Ground II claim is procedurally defaulted, the Court may nevertheless address it because it can be easily resolved: "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *see also Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted); *cf.* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). In the present case, the question of procedural default presents a complicated question of Michigan law and is unnecessary to the disposition of this case; I will therefore assess the merits of Petitioner's ineffective assistance claim in Ground II.

Petitioner contends that if his trial attorney had better "concentrated" during his cross-examination of witnesses Ritter, Polokovich, Silverman, Meister, Lyons, Russell Williams, and Dingman, counsel would have uncovered the fact that the witnesses were lying about the outside parking lot surveillance camera tape, revealing the conspiracy to hide the tape from Petitioner; which would have led to an acquittal. Pet'r Br. in Supp. of Am. Pet., 19-20. The U.S. Supreme Court invokes a two-pronged test by which to evaluate claims of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To establish ineffective assistance, a petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. 466 U.S. at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of

overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). This Court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *See Strickland*, 466 U.S. at 690. Even if the Court determines that counsel's performance was outside that range, Petitioner is not entitled to relief if counsel's error had no effect on the judgment. *See Id.* at 691. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003), *cert. denied*, 540 U.S. 1164 (2004).

I find from a review of the trial transcripts that counsel's cross-examination of Ritter, Polokovich, Silverman, Meister, Lyons, Russell Williams, and Dingman fell well within the objective standard of reasonableness. There is no certainty that if Petitioner's trial counsel had better "concentrated" during cross-examination he would have necessarily revealed that the prosecution witnesses were all lying about the existence of reliable footage on the parking lot camera tape. Rather, this allegation is pure conjecture, at best. A trial attorney's failure to raise a theory or line of questioning that is mere speculation does not rise to ineffective assistance of counsel. *See Bowen v. Foltz*, 763 F.2d 191, 194 (6th Cir. 1985) ("a defendant must make more than merely speculative assertions" when arguing ineffective assistance of counsel); *see also United States v. Diaz*, No. 95-1382, 1996 WL 341177, at *4 (6th Cir. June 19, 1996). Where counsel's performance did not fall below an objective standard of reasonableness, the court need not reach the question of prejudice. *See United States v. Foreman*, No. 01-3892, slip op. at 8-9 (6th Cir. Mar. 25,

- 37 -

2003).  Under the foregoing analysis under the AEDPA, Petitioner is not entitled to habeas relief on the claims in Ground II.

### C. Ground III: Ineffective Assistance of Trial and Appellate Counsel

In Ground III, Petitioner asserts that his trial counsel was ineffective because he failed to: (1) object to an improper jury instruction regarding accomplice Russell Williams' testimony (Pet. at 27-31); and (2) move for a mistrial after evidence of Petitioner's escape from jail was admitted (Pet. at 27-31).  Petitioner further alleges in Ground III that he was denied effective assistance of appellate counsel because his appellate attorneys[8] did not raise these two issues on direct appeal. Pet. at 29-33.

Petitioner's Ground III ineffective assistance of trial and appellate counsel claims are procedurally defaulted.  Petitioner raised these claims for the first time in his first Rule 6.500 motion for relief from judgment in the Calhoun County Circuit Court. (Def.-Appellant's Delayed Application for Leave to Appeal, 1/2/03, 5, docket #48.)  The circuit court apparently never addressed this or any of the other substantive issues in Petitioner's motion.  (Circuit Ct. Order, 6/6/01, docket #47.)  Both the Michigan Court of Appeals and Michigan Supreme Court denied leave to appeal this issue based on MICH. CT. R. 6.508(D) because Petitioner had not met his burden of establishing entitlement to the requested relief.  (Mich. Ct. App. Order, 12/6/02, docket #47; Mich. Order, 5/30/03, docket #48.)  In cases where the Michigan Court of Appeals and Michigan Supreme Court deny leave to appeal on the basis that a petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)," it is sufficiently clear that the supreme court intended to invoke a procedural bar.  *See Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004),

---

[8]Petitioner was represented by three different appellate attorneys through the course of his direct appeal.  (Mich. Ct. App. No. 182699 Docket ##1, 5, 8, 9.)  In his two subsequent appeals, Petitioner represented himself.

*cert. denied*, 544 U.S. 1002 (2005); *Abela v. Martin*, 380 F.3d 915, 923 (6th Cir. 2004); *see also Hargrave-Thomas v. Yukins*, 374 F.3d 383, 388 (6th Cir. 2004); *Burroughs v. Makowski*, 282 F.3d 410, 413-14 (6th Cir. 2002), *cert. denied*, 126 S.Ct. 1323 (2006); *Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. Under MICH. CT. R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal.  For claims that could have been raised, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." MICH. CT. R. 6.508(D)(3)(a)-(b).  Because MICH. CT. R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place some time thereafter, MICH. CT. R. 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action.  *See  Luberda*, 211 F.3d at 1007; *Rogers v. Howes*, 144 F.3d 990, 994 (6th Cir. 1998).

Although Ground III is procedurally barred, I will nonetheless address its merits because it is easily resolvable against Petitioner.  *See Lambrix,* 520 U.S. at 525; *Nobles,* 127 F.3d at 423-24; 28 U.S.C. § 2254(b)(2).  As an initial matter, I note that the trial court did in fact give a cautionary instruction regarding accomplice Russell Williams' testimony, albeit on the limited point that Russell Williams made a deal with the prosecution in exchange for his testimony.  (*See* Tr. III, 48, docket #43; *see also* Section E, below.)  Failure to object to the accomplice instruction at trial constituted a forfeiture of the issue before the state courts; the issue thus would have been reviewed only if it was a plain error affecting Petitioner's substantial rights.  *See People v. Gonzalez*, 664 N.W.2d 159, 163 (Mich. 2003).  A trial attorney's decision as to whether to object to a jury instruction and request another one is a matter of trial strategy that will not be lightly disturbed.  *Id.*

at 164.  Trial counsel is not considered ineffective for failing to request a cautionary instruction regarding accomplice testimony unless that failure fell below an objective standard of reasonableness and the omission so prejudiced Petitioner that he was deprived of a fair trial.  *Id.*  Here, the trial court specifically instructed the jury as to Russell Williams' deal with the prosecution in exchange for his testimony (Tr. III, 48, docket #43); given this fact, trial counsel's failure to request an even more detailed instruction did not fall below an objective standard of reasonableness.  *See Gonzalez*, 664 N.W.2d at 164.  Furthermore, trial counsel's failure to request a more detailed instruction did not so prejudice Petitioner as to deprive him of a fair trial.  There was ample evidence supporting Petitioner's conviction, including eyewitness testimony of numerous witnesses other than Russell Williams.  I therefore conclude that the trial would not have turned out differently in the absence of Russell Williams' testimony. Additionally, the trial court explicitly charged the jury with the task of weighing Russell Williams' testimony in view of the facts that Williams was involved in the incident and had negotiated a deal with the prosecution.  (Tr. III, 48, docket #43.)  Michigan courts presume that juries follow their instructions. *People v. Graves*, 581 NW2d 229, 234 (1998).  In light of these facts, Petitioner's counsel was not ineffective on this basis.

Equally meritless is Petitioner's Ground III allegation that trial counsel was ineffective for failing to request a mistrial after the admission of evidence regarding Petitioner's jail escape. I note from the record that trial counsel objected to certain aspects of testimony regarding Petitioner's escape from jail.  (*See* Trial Tr. II, 20-23, docket #42.)  Immediately after counsel objected, the court instructed the jury that flight from jail did not necessarily indicate a guilty state of mind.  (Tr. II, 23-24.)  Trial counsel's decision not to request a mistrial is a matter of trial strategy that will not be lightly disturbed.  *See Strickland*, 466 U.S. at 689.  Counsel's decision not to request a mistrial did not fall below an objective standard of reasonableness, given the fact that counsel

objected to certain aspects of the jail break evidence and the court gave an explicit instruction thereon immediately thereafter.  *See* Tr. II, 20-24.  Because there was ample evidence to convict Petitioner, trial counsel's failure to request a mistrial did not so prejudice Petitioner that was he was deprived of a fair trial.  *See Id.*  Based on the foregoing analysis, Petitioner is not entitled to habeas relief on Ground III.

### D. Ground IV: Trial Court's Failure to Properly Instruct Jury Regarding Accomplice's Testimony

Petitioner alleges that his Fifth and Fourteenth Amendment due process rights were violated when the trial court failed to instruct the jury that Russell Williams' testimony was to be designated and treated as that of an "undisputed accomplice." Pet. at 33-37.  With regard to Russell Williams' testimony, the trial court instructed the jury only on the fact that Russell Williams made a deal with the prosecution in exchange for his testimony:

> Now, you've heard testimony that one witness, Russell Williams, made an agreement with the prosecutor about charges against him in exchange for his testimony in this trial.  You are to consider this evidence only as it relates to Mr. Williams' credibility and as it may tend to show Mr. Williams' bias or self interest.

(Tr. III, 48, docket #43.)  Petitioner argues that the trial court should have further cautioned the jury to take a "skeptical approach" to Williams' testimony because an accomplice's testimony is "fraught with weakness due to the effect of fear, threats, hostility, motive, or hope of leniency"; hence the jury should have been warned of these "infirmities."  Pet. at 35-36.  He maintains the trial court should have given the cautionary instructions set forth at Criminal Jury Instructions 5:4, 5:5, and 5:6. Pet. at 28.

Petitioner admits that he did not raise this issue at trial, a fact noted by the Michigan Court of Appeals, which on direct appeal refused to address the issue because it was not preserved

- 41 -

for appellate review.  (Mich. Ct. App. Op., 3/13/98, docket #45.)  In so holding, the court of appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim.  The Michigan Supreme Court denied leave on this issue because it was not convinced it should address it.  (Mich. Order, 12/30/98, docket #46.)  Additionally, Petitioner raised this issue in his motion for relief from judgment, which never addressed the issue, and in his second round of appeals to the Michigan Court of Appeals and Michigan Supreme Court; both of which denied review under MICH. CT. R. 6.508(D).  (Circuit Ct. Order, 6/6/01, docket #47; Def.-Appellant's Application for Leave to Appeal, 6/5/02, I, 10-17 and Mich. Ct. App. Order, 12/6/02, docket #47; Def.-Appellant's Delayed Application for Leave to Appeal, 1/2/03, 5, iii, 22-29 and Mich. Order, 5/30/03, docket #48.)

Ground IV is procedurally barred on two bases: Petitioner's failure to comply with Michigan's contemporaneous objection rule; and the Michigan appellate courts' denial of review under MICH. CT. R. 6.508(D).  The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim.  (Mich. Ct. App. Op., 3/13/98, docket #45.)  It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial.  *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985).  A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy."  *Lee*, 534 U.S. at 385.  Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court.  *See Wainwright,* 433 U.S. at 86-88: *Lancaster,* 324 F.3d at 437; *West,* 73 F.3d at 84.  Although Ground IV is procedurally barred, I will address its merits because it is easily resolvable against Petitioner.  *See Lambrix,* 520 U.S. at 525; *Nobles,* 127 F.3d at 423-24; 28 U.S.C. § 2254(b)(2).

A claim that a trial court gave an improper jury instruction is not cognizable on habeas review unless a petitioner shows that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). *See also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same). If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

Here, Petitioner has not shown that the trial court's instructions regarding Russell Williams' testimony "so infected the entire trial that the resulting conviction violates due process." *See Henderson*, 431 U.S. at 155. The trial court instructed the jury adequately with regard to Russell Williams' testimony. Furthermore, there was ample evidence to convict Petitioner on all charges, thus his convictions do not violate his due process rights. Habeas relief is therefore not warranted based on Ground IV.

### E. Ground V: Trial Court's Admission of Jail Break Evidence

Petitioner next argues that his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial and an impartial jury were violated by the trial court's admission of evidence regarding his escape from the Calhoun County jail. Pet. at 37-41. He claims that under both state law and a federal four-step test for weighing flight evidence, for which he provides no cites, the jail break evidence was irrelevant, and far more prejudicial than probative. Pet. at 39-41. In his amendment to his habeas application, Petitioner adds that the trial court failed to follow Michigan Supreme Court procedure under MICH. R. EVID. 404(b) to determine whether the jail break evidence was admissible. Pet'r Br. in Supp. of Am. Pet. at 23 (docket #20).

- 43 -

Petitioner's state-law arguments are not cognizable in a habeas corpus action. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991). To the extend Petitioner states federal claims in Ground V, they are procedurally defaulted on two bases: (1) on direct appeal, the Court of Appeals held that Petitioner failed to preserve the issue for review and the Michigan Supreme Court denied review (Mich. Ct. App. Op, 3/13/98, docket #45; Mich. Order, 12/30/98, docket #46); and (2) both state appellate courts denied leave based on MICH. CT. R. 6.508(D) in Petitioner's second appeal. (Mich. Ct. App. Order, 12/6/02, docket #47; Mich. Order, 5/30/03, docket #48.) Notwithstanding Petitioner's procedural default on Ground V, I will address the merits of this claim because it is easily resolvable against Petitioner. *See Lambrix,* 520 U.S. at 525; *Nobles,* 127 F.3d at 423-24; 28 U.S.C. § 2254(b)(2).

The trial court was attentive and adequate in instructing the jury regarding the jail break evidence, and limited its scope. (*See* Tr. II, 23-24, 92.) Petitioner's assertion that the prejudice of his jail break so far outweighed its probative value that it "abrogat[ed]" his right to a fair trial before an impartial jury (Pet. at 39, 40-41) is meritless. There was ample evidence regarding the May 21, 1994 incident to convict Petitioner; thus the evidence of his later escape from jail did not strip him of his presumed innocence such that absent that evidence, Petitioner would have been acquitted.

### F. Ground VI: Ineffective Assistance of Trial and Appellate Counsel

In Ground VI, Petitioner asserts that his trial counsel was ineffective because he failed to: (1) dismiss a biased juror (Pet. at 41-42, 44-45); (2) note that the felony complaint against Petitioner was unsigned (Pet. at 42, 43-44, 52-53); and (3) move for a change of venue based on extensive publicity about the case (Pet. at 42, 43, 54-58). Petitioner further alleges in Ground VI

that he was denied effective assistance of appellate counsel because his appellate attorneys did not raise issues (1)-(3) above on direct appeal.  Pet. at 29-33; 43-47.

The ineffective assistance of trial and appellate counsel arguments in Ground VI are procedurally defaulted.  Petitioner raised these arguments for the first time in his "Supplement" to his first Rule 6.500 motion in the trial court, which never addressed the issue.  (Circuit Ct. Order, 6/6/01, docket #47; Def.-Appellant's Delayed Application for Leave to Appeal, 1/2/03, 6, docket #48.)  He did not raise these claims before the Michigan Court of Appeals, but did raise them before the Michigan Supreme Court, which denied leave under MICH. CT. R. 6.508(D).  (Def.-Appellant's Delayed Application for Leave to Appeal, 1/2/03, iii, 57-61, docket #48.)  The claims of ineffective assistance of counsel raised in Ground VI (and similarly the ineffective assistance of counsel claim also suggested in Ground IX discussed in Section I., *infra*) are therefore defaulted because they were not presented in all the state courts but a state procedural rule now prohibits the state court from considering them.  *See Cone*, 243 F. 3d at 967.

Petitioner also claims that on a number of occasions he asked his trial attorney to move for a change of venue because of the publicity surrounding the case; but counsel repeatedly refused because it was "to [sic] much of a hassle."  Pet. at 55-57.  Petitioner adds that his attorney called the escape from jail "cool," and commented to Petitioner, "you showed them."  *Id*.; Pet. Ex. K.  "The existence of pretrial publicity alone does not necessitate a change of venue."  *People v. Walendzinski*, No. 225043, 2002 WL 1160916, at *1 (Mich. Ct. App. May 31, 2002) (citing *People v. Jendrzejewski*, 566 N.W.2d 530 (Mich. 1997)).  To obtain a change of venue, a defendant must show a "strong community feeling against him, or publicity that is so extensive and inflammatory that jurors could not remain impartial."  *Id*. (citing *People v. Lee*, 537 N.W.2d 233 (Mich. Ct. App. 1995)).  As an initial matter, Petitioner has not shown a strong community feeling against him, nor

- 45 -

that publicity around his case was so inflammatory that jurors could not have been impartial. *See* Section I, below. Furthermore, his trial attorney's conduct in deciding whether to move for a change of venue is a matter of trial strategy that will not be second-guessed with the benefit of hindsight. *Id*. Furthermore, Petitioner has neither argued nor shown that if counsel would have been granted a change of venue, that Petitioner necessarily would have been acquitted. *See Id.*

Equally meritless is Petitioner's claim that trial counsel was ineffective because he failed to "acknowledge" that the pre-arrest complaint was unsigned. Petitioner does not cite any authority whatsoever on this claim, nor could he. "[E]xcept for the issue of notice, a claimed deficiency in a state criminal indictment is not cognizable in federal habeas corpus." *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir.2002); see also *Olsen v. McFaul*, 843 F.2d 918, 930 (6th Cir.1988).

Because Petitioner's Ground VI ineffective assistance of trial counsel claims are procedurally barred or otherwise meritless and would not have prevailed if appellate counsel had raised them on direct appeal, Petitioner's ineffective assistance of appellate counsel claims also fail.

### G. Ground VII: Biased Juror

Petitioner next claims that he was denied due process, a fair trial, and an impartial jury as required by the Sixth and Fourteenth Amendments because he had confrontations with one of the jurors in the past, when the juror was a school bus driver. Pet. at 47-49. Petitioner claims that, as a result of his altercations with this juror, Petitioner was permanently "banned" from riding the school bus. Pet. at 47. He contends that the presence of this juror, who had a hostile past relationship with Petitioner, presents "presumed or implied bias." Pet. at 47. He further claims that the juror may have exerted "undue influence" on the other jury members. Pet. at 48. Petitioner claims to have brought the issue to his trial attorney's attention, but that his attorney failed to object

to the juror.  Pet. at 49.[9]  He argues that he is entitled to a new trial, even in the absence of actual prejudice, because an impartial jury is a "structural defect."  Pet. at 49.  Petitioner cites no authority whatsoever in support of this ground.

Petitioner raised Ground VII for the first time in his "Supplement" to his first motion for relief from judgment.  (Def.-Appellant's Delayed Application for Leave to Appeal, 1/2/03, 6-7, docket #48.)  The trial court never addressed the issue.  (Circuit Ct. Order, 6/6/01, docket #47.)  Petitioner did not raise this issue in the Michigan Court of Appeals, but did raise it in the Michigan Supreme Court, which denied leave under MICH. CT. R. 6.508(D).  (Def.-Appellant's Delayed Application for Leave to Appeal, 1/2/03, iii, 45-50; Mich. Order, 5/30/03, both at docket #48.)  Ground VII is procedurally defaulted because Petitioner failed to raise it in all state courts and state procedural rules now prohibit the state courts from considering it.  *See Cone*, 243 F. 3d at 967.  Petitioner concedes that he failed to object to the potentially biased juror at trial.  Pet. at 49.  He contends that his failure to object does not preclude review by this Court, however, because an impartial jury is a "structural defect" "requir[ing] a new trial without a showing of actual prejudice."  *Id*.  There is no authority to support this assertion.  Therefore, Ground VII is procedurally defaulted.

### H. Ground VIII: Unsigned Pre-Arrest Felony Complaint

Petitioner asserts that his Fourth, Fifth, Sixth, and Fourteenth Amendment rights were violated because the pre-arrest complaint charging him was unsigned.  Pet. at 50, 53.  Petitioner alleges that because the felony complaint was unsigned, "all proceedings thereafter were invalid."  Pet. at 53.  For relief, he requests that this Court set aside his convictions and sentences and dismiss

---

[9]Petitioner's contention that trial counsel was ineffective because he did not seek to excuse the juror at issue is addressed in Section F, above.

all charges against him with prejudice, or, in the alternative, grant him a new trial or evidentiary hearing after appointing counsel.  Pet. at 54.

While Petitioner cites no authority in support of Ground VIII, he states that "whether the judicial phase of a prosecution is properly initiated by a complaint infirm under Fourth Amendment standards is primarily a question of Michigan law."  Pet. at 52.  To the extent that Petitioner brings a claim under Michigan law, it is not cognizable here.  "Federal habeas corpus relief does not lie for errors of state law."  *Estelle,* 502 U.S. at 67.

Ground VIII is procedurally defaulted.  Petitioner raised this argument for the first time in his "Supplement" to his first Rule 6.500 motion in the trial court, which never addressed the issue.  (Circuit Ct. Order, 6/6/01, docket #47; Def.-Appellant's Delayed Application for Leave to Appeal, 1/2/03, 7, docket #48.)  He did not raise these claims before the Michigan Court of Appeals, but did raise them before the Michigan Supreme Court, which denied leave under MICH. CT. R. 6.508(D).  (Mich. Ct. Order, 5/30/03 and Def.-Appellant's Delayed Application for Leave to Appeal, 1/2/03, iii, 51-56, docket #48.)  The Grounds VI and IX claims of ineffective assistance of counsel are therefore defaulted because they were not presented in all state courts but a state procedural rule now prohibits the state court from considering them.  *See Cone*, 243 F. 3d at 967.  Although Ground VI is procedurally defaulted, I will nevertheless assess its merits because it is easily resolvable against Petitioner.  *See Lambrix,* 520 U.S. at 525; *Nobles,* 127 F.3d at 423-24; 28 U.S.C. § 2254(b)(2).

To the extent Petitioner brings this claim as one arising the United States Constitution, it is meritless.  Although the Constitution does not require states to provide an indictment, *Branzburg v. Hayes*, 408 U.S. 665, 687-88, n.25 (1972), the due process clause does require that "whatever charging method a state utilizes, a criminal defendant must be given notice

of the charges against him sufficient to allow him to prepare a defense." *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir.1984) (citing *Combs v. Tennessee*, 530 F.2d 695 (6th Cir.1976), and *In Re Ruffalo*, 390 U.S. 544 (1968)). Furthermore, as long as a charging document properly gives notice, "a claimed deficiency in a state criminal indictment is not cognizable in federal habeas corpus." *Roe,* 316 F.3d at 570; see also *Olsen,* 843 F.2d at 930. Here, Petitioner does not argue that the felony complaint failed to properly notify him of the elements of the offenses with which we was charged; but claims a mere ministerial error in that it was unsigned. This alleged deficiency in the felony complaint is therefore not a cognizable basis for habeas relief. *See Id*.

### I. Ground IX: Trial Court's Failure to *Sue Sponte* Order a Change of Venue Where Case Was Subject of Extensive Pretrial Publicity

Petitioner next claims that the trial court violated his Fifth, Sixth, and Fourteenth Amendment rights failing to *sua sponte* order a change of venue. Pet. at 54-58.[10] To illustrate the publicity surrounding this case, Petitioner attaches a number of newspaper articles. Pet. at 54 and Ex. J. He further references, without documentary or other support, to television and radio coverage of the case. Pet. at 54, 56. Petitioner contends that extensive publicity about his trial and escape from jail rendered an impartial jury and fair trial impossible in this case. Pet. at 57-58.

Ground IX was not raised in all Michigan courts and a state procedural rule now prohibits the state courts from considering them, those claims are considered exhausted. *See Cone,* 243 F.3d at 967. The claim is nonetheless procedurally barred because a state-law default prevents further state consideration of a federal issue; thus the federal courts ordinarily are precluded from considering the issue on habeas corpus review. *See Nunnemaker*, 501 U.S. at 801; *Engle,* 456 U.S.

---

[10]In Ground IX, Petitioner also argued his trial attorney violated his Fifth, Sixth, and Fourteenth Amendment rights by failing to move for a change of venue. The ineffective assistance of trial counsel aspect of Ground IX is addressed in Section F, above.

at 129 (1982). I will address the merits of Ground IX despite their procedurally defaulted status because it is easily resolvable against Petitioner. *See Lambrix,* 520 U.S. at 525; *Nobles,* 127 F.3d at 423-24; 28 U.S.C. § 2254(b)(2).

It is a "basic requirement of due process" guaranteed by the right to trial by jury that the "criminally accused [receive a] fair trial by a panel of impartial, 'indifferent' jurors." *Goins v. McKeen*, 605 F.2d 947, 951 (6th Cir. 1979) (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). With regard to claims arising from pre-trial publicity, the Sixth Circuit has recognized the existence of clearly established Supreme Court authority distinguishing between "cases involving presumed prejudice - when the setting of the trial is inherently prejudicial, - and actual prejudice - when review of both the jury *voir dire* testimony and the extent and nature of media coverage indicates a fair trial was impossible." *Ritchie v. Rogers*, 313 F.3d 948, 952 (6th Cir. 2002) (internal quotations and citations omitted); *see also Nevers v. Killinger*, 169 F.3d 352 (6th Cir. 1999), *abrogated on other grounds by Harris*, 212 F.3d at 943.

The Supreme Court first acknowledged the distinction between actual and presumed prejudice in *Murphy v. Florida*, 421 U.S. 794 (1975). The Court discussed three previous cases in which it found circumstances warranting a presumption of prejudice: *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). *Rideau* involved the televising of an in-jail 20-minute interrogation of the defendant by the police in which the defendant confessed to the murder for which he was subsequently convicted. The Court concluded that Rideau presumptively could not have received a fair trial in that parish "because it considered the trial under review 'but a hollow formality'--the real trial had occurred when tens of thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt before the cameras." *Murphy*, 421 U.S. at 799. The trial in *Estes* had been conducted in a "circus

atmosphere," where the courtroom was overrun with television equipment. *Murphy*, 421 U.S. at

799.  *Sheppard* similarly involved extremely inflammatory publicity, as well as a carnival-like

atmosphere in the courtroom created by the media presence. *Murphy*, 421 U.S. at 799.  Referring

to *Estes* and *Shepard*, the Court stated:

> The proceedings in these cases were entirely lacking in the solemnity
> and sobriety to which a defendant is entitled in a system that
> subscribes to any notion of fairness and rejects the verdict of a mob.
> They cannot be made to stand for the proposition that juror exposure
> to information about a state defendant's prior convictions or to news
> accounts of the crime with which he is charged alone presumptively
> deprives the defendant of due process.

*Murphy*, 421 U.S. at 799.

In the absence of the "televised confession amounting to a trial" or "carnival

atmosphere," actual prejudice may be inferred from the nature and extent of the publicity and the

juror voir dire testimony. *Ritchie*, 313 F.3d at 955.  The Supreme Court made such a finding of

actual prejudice in *Irvin v. Dowd*, 366 U.S. 717 (1961).  In *Irvin*, the defendant was tried in a small

community that was widely aware of his prior convictions, his confession to 24 burglaries and six

murders (including the one for which he stood trial) and his unaccepted offer to plead guilty in order

to avoid a death sentence. *Murphy*, 421 U.S. at 798.   In addition to this prejudicial information

before the trial began, eight of the  twelve empaneled jurors had already formed the opinion that the

defendant was guilty. *Id.*  Furthermore, 268 of the 430 venire men were excused because they

indicated an opinion as to the petitioner's guilt.  In reaching its decision in *Irvin*, the Supreme Court

noted:

> To hold that the mere existence of any preconceived notion as to the
> guilt or innocence of an accused, without more, is sufficient to rebut
> the presumption of a prospective juror's impartiality would be to
> establish an impossible standard.  It is sufficient if the juror can lay

aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 722-23.  Nevertheless, "the juror's assurances that he is equal to the task cannot be dispositive of the accused's rights, it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Murphy*, 421 U.S. at 800 (*quoting Irvin*, 366 U.S. at 723).  After discussing the facts of *Irvin*, the *Murphy* Court noted, " In these circumstances, the [*Irvin*] Court readily found actual prejudice against the petitioner to a degree that rendered a fair trial impossible." *Murphy*, 421 U.S. at 798.

Comparing the facts in *Murphy*, where the petitioner claimed that the jury had learned of a prior conviction and certain facts about the crime at issue due to extensive pre-trial media coverage, the Supreme Court found "no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside." *Murphy*, 421 U.S. at 799.  In *Murphy*, for example, only 20 of the 78 venire men were excused because they had formed an opinion as to the petitioner's guilt.  The Supreme Court followed both the principles and result of *Murphy* in two subsequent cases concerning extensive pre-trial publicity:  *Dobbert v. Florida*, 432 U.S. 282 (1977) and *Patton v. Yount*, 467 U.S. 1025 (1984).  Dobbert, who was accused of torturing and murdering his children, claimed that he was denied a fair trial as the result of excessive press coverage.  The Supreme Court disagreed, stating:

Petitioner's argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the voir dire examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected. But under *Murphy*, extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well

aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere . . . utterly corrupted by press coverage," *Murphy v. Florida, supra*, 421 U.S., at 798, 95 S. Ct., at 2035. One who is reasonably suspected of murdering his children cannot expect to remain anonymous. Petitioner has failed to convince us that under the "totality of circumstances," *Murphy, supra*, the Florida Supreme Court was wrong in finding no constitutional violation with respect to the pretrial publicity.

*Dobbert*, 432 U.S. at 303.  *Patton* similarly involved the much publicized case of a high school teacher accused of raping and murdering one of his female students.  After reviewing the extent and nature of the pretrial publicity and the *voir dire* testimony, the Court again concluded that "the jurors at Yount's trial had [not had] such fixed opinions that they could not judge impartially the guilt of the defendant."  *Patton*, 467 U.S. at 1035.

This case does not present those rare circumstances in which the criminal proceedings were so utterly corrupted by media coverage that prejudice must be presumed.  Unlike *Estes* and *Shepard*, this cases did not involve a media-created carnival atmosphere in the courtroom during trial, nor does it involve the televising of a videotaped confession as found in *Rideau*.  Accordingly, Petitioner is not entitled to a presumption of prejudice.  Instead, the Court must consider whether actual prejudice may be inferred from the nature and extent of the publicity and the juror voir dire testimony.  *See Ritchie*, 313 F.3d at 955.

I note that the voir dire proceedings from Petitioner's trial are not included in the Rule 5 materials provided by Respondent.  Petitioner bases his Ground IX claim on newspaper articles surrounding his trial, escape from jail, and state and other officials' response to the escape. Pet. Ex. J.  However, the extent and nature of the newspaper coverage Petitioner attaches to his petition does not indicate a fair trial was impossible.  The articles cover the charges against Petitioner, Russell Williams, and Eric Williams; the basic facts of the May 21 incident at Meijer;

the trial; Petitioner's jail escape with three other inmates; and officials' pursuit of the four escapees. Pet. Ex. J. Some of the articles focus on broader issues surrounding jail security and corrections accountability for the escapes. *Id.* Indirectly referencing the charges pending against them, the four escapees are called "very dangerous" in one article regarding the jail break; however, I note that the overwhelming evidence at trial that Petitioner held a loaded gun within two feet of a man's head supports his convictions in the absence of a reference to him as a "dangerous" jail escapee in a newspaper article. In sum, the articles contain nothing of a nature so inherently prejudicial that a juror would be unable to disregard it. The nature of the publicity and whether it is the sort that could be laid aside by jurors, rather than its volume, is the crucial factor to be considered. *See Murphy*, 421 U.S. 794.

Petitioner could not expect to remain anonymous given the nature of the events that took place at the Battle Creek Meijer store. As the Supreme Court stated in *Dobbert*, 432 U.S. at 303, the fact that the community was well aware of the crime is not sufficient by itself to render a trial constitutionally unfair. The media coverage in this case does not reveal a climate of hostility in the community that rendered the jurors unable to decide Petitioner's case fairly and impartially. Accordingly, I cannot find that the trial court's failure to *sua sponte* order a change of venue was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

Because Petitioner's Ground IX ineffective assistance of trial counsel claims are meritless and would not have prevailed if appellate counsel had raised them on direct appeal, Petitioner's ineffective assistance of appellate counsel claims also fail.

**J. Ground X: Retroactive Application of *People v. Randolph* to Vacate Petitioner's Armed Robbery Conviction**

In his Amendment of Grounds in Support of Petition for Writ of Habeas Corpus, Petitioner argues that the Michigan Supreme Court's holding in *People v. Randolph*, 648 N.W. 2d 164 (Mich. 2002), should be applied retroactively to invalidate his armed robbery conviction.  Pet'r Br. in Supp. of Am. Pet., 4-11 (docket #20).

In *Randolph*, the defendant took $120 worth of merchandise from a Meijer store and concealed it beneath his coat.  648 N.W.2d at 166, 172.  Meijer security guards witnessed the theft and apprehended the defendant when he emerged from the store.  *Id.*  The prosecution argued that when the security guards identified themselves, the defendant tried to run away, the guards placed him in an "escort hold," and the defendant broke free, swinging his arms at the guards, assaulting at least one of them, and dropping the merchandise he had stolen.  *Id.*  A jury convicted the defendant of unarmed robbery.  *Id.*  Reversing the conviction, the Michigan Court of Appeals applied the "transactional approach" to robbery, that is, a robbery is completed when a defendant has escaped with stolen merchandise; thus a completed larceny rises to a robbery if a defendant uses force after the taking and before reaching temporary safety.  *Id.*  The court of appeals found that because the defendant was unsuccessful in escaping, the larceny was never completed under the "transactional approach"; the court remanded for resentencing on the lesser included offense of larceny in a building.  *Id.*

The Michigan Supreme Court affirmed in part and reversed in part.  It began its opinion noting, "[t]his Court has never recognized the 'transactional approach'" to robbery; rather, it noted, the "transactional approach" was the result of the Michigan Court of Appeals' efforts to "expand" the codified requirements for robbery through its decisions over the course of the

- 55 -

preceding 30 years.  648 N.W.2d at 168-169.  The supreme court rejected the transactional approach to robbery because it "can not be harmonized either with the language of [Michigan's unarmed robbery statute] or with the common-law history of our unarmed robbery statute . . . and must be abandoned."  648 N.W.2d at 169, 171-72 (emphasis added).  The court explicitly overturned four Michigan Court of Appeals cases in which the transactional approach to robbery was established. 648 N.W.2d at 172.[11]  The court further reasoned that by deeming a larceny, in which no force used before or during the taking, as a robbery, based on force used *after* the taking is completed, the transactional approach "inappropriately characterizes a completed larceny as a robbery."  648 N.W.2d at 170.  The court held that larceny is complete when the taking occurs; and "[t]he offense does not continue."  648 N.W.2d at 171.  The supreme court declined to "extend the transaction that began with the in-store taking to include the struggle in the parking lot," holding:

> We overrule the "transactional approach" to unarmed robbery and reassert that the force, violence, assault or putting in fear underlying the robbery must occur before or contemporaneously with the felonious taking.  Because this defendant did not use force, violence, assault, or putting in fear to accomplish his taking of property, he did not commit unarmed robbery.

---

[11] *People v. Tinsely*, 439 N.W.2d 313 (Mich. Ct. App. 1989); *People v. Turner*, 328 N.W.2d 5 (Mich. Ct. App. 1982); *People v. LeFlore*, 293 N.W.2d 628 (Mich. Ct. App. 1980); and *People v. Sanders*, 184 N.W.2d 269 (Mich. Ct. App. 1970).  Although the *Randolph* court addressed a conviction for *unarmed* robbery, some of the four cases it overruled applied the transaction approach to *armed* robbery.  *People v. Scruggs*, 662 N.W.2d 849, 851 n.7 (Mich. Ct. App. 2003).  The Michigan Court of Appeals has concluded that this aspect of the *Randolph* decision sent an "unmistakable signal" that *Randolph* applies to armed robbery cases.  *Id*.  Based on this "signal," the court of appeals has explicitly held that *Randolph* applies to the armed robbery statute, under which Petitioner was convicted in this case. *See Scruggs*, 662 N.W.2d at 850.

648 N.W.2d at 174 (emphasis added).  The court affirmed the vacation of the defendant's unarmed robbery conviction, but reversed the remand for retrial; instead remanding for imposition of a conviction on the lesser offense of larceny in a building.  648 N.W.2d at 175.[12]

Here, Petitioner argues that a failure to retroactively apply *Randolph* to invalidate his 1994 armed robbery conviction would violate his Fourteenth Amendment Due Process rights because Michigan cannot convict him of armed robbery when all the elements of that offense are not present here.  Pet'r Br. in Supp. of Am. Pet. at 4, 7-8.  He contends that the facts of his case are identical to those in *Randolph*; as a result, the holding also applies here; *i.e.*, because Petitioner left Meijer with Eric Williams, who was wearing boots that had not been paid for, Petitioner committed "retail fraud" or "larceny in a building," not armed robbery, because he "did not take the property from on the presence of any person."  Pet'r Br. in Supp. of Am. Pet. at 7-8.  Petitioner further points out that his brandishment of the gun later in the Meijer parking lot was a separate crime, "at most, a felonious assault," rather than armed robbery, under *Randolph*.  Pet'r Br. in Supp. of Am. Pet. at 8, 10.  Petitioner additionally claims that his Equal Protection rights will be violated if *Randolph* is not applied here.  Pet'r Br. in Supp. of Am. Pet. at 4-11.  He argues that decisions in *Randolph* and *Scruggs*, along with the revisions to Michigan's armed robbery statute, indicate that courts' application of the "transactional approach" to armed robbery was wrong; hence *Randolph* clarified the law, rather than changing it, and should therefore be applied retroactively.  Pet'r Br. in Supp. of Am. Pet. at 7.  Petitioner requests an order vacating his armed robbery conviction and requiring a new trial without the armed robbery charge included.  Pet'r Br. in Supp. of Am. Pet. at 10.

---

[12]I note that the Michigan Legislature recently overturned *Randolph* by amending both the armed and unarmed robbery statutes to provide that force used after the initial larceny may satisfy the statutes; in effect reinstating the transactional approach to robbery.  *See* MICH. COMP. LAWS §§ 750.529, 530; *see also Turner v. Warren*, No. 05-72274, 2006 WL 1109300, at *3 n.3 (E.D. Mich. Apr. 26, 2006).

Petitioner raised Ground X for the first time in his second Rule 6.500 motion for relief from judgment in the trial court, which denied relief.  (Def.-Appellant's Br. in Support of Delayed Application for Leave to Appeal, 6/17/04, A, 3-10, docket #49.)  The Michigan Court of Appeals reversed Petitioner's armed robbery conviction, and remanded to the trial court for retrial on any lesser charges.  (Mich. Ct. App. Op., 4/19/05, docket #49.)   The Michigan Supreme Court reversed the court of appeals and reinstated the armed robbery conviction in lieu of granting leave to appeal. (Mich. Order, 9/23/05, docket #50.)  Because Petitioner "fairly present[ed]" his *Randolph* and *Scruggs* claims to the Michigan courts, Grounds X and XI are exhausted and may be addressed by this Court.  *See Picard,* 404 U.S. at 275-77.

The United States Supreme Court's decision in *Fiore v. White*, 531 U.S. 225 (2001) controls on the validity of Petitioner's armed robbery conviction in light of the Michigan Supreme Court's decision in *Randolph*.  In *Fiore*,  after the habeas petitioner's conviction became final, the Pennsylvania Supreme Court interpreted the statute under which he had been convicted for the first time.  531 U.S. at 226.  The petitioner could not have been convicted under the Pennsylvania Supreme Court's interpretation of the statute.  *Id*.  The United States Supreme Court granted certiorari to assess "when, or whether, the Federal Due Process Clause requires a State to apply a ***new*** interpretation of a state criminal statute retroactively to cases on collateral review."  531 U.S. at 226 (emphasis added).  The U.S. Supreme Court certified a question to the Pennsylvania Supreme Court inquiring whether the state supreme court's interpretation of the statute "state[d] the correct interpretation of the law of Pennsylvania at the date the defendant's conviction became final."  *Id*.; *see also Fiore v. White*, 528 U.S. 23, 29-30 (1999).  In response, the Pennsylvania Supreme Court explained that its interpretation of the statute "merely *clarified* the plain language of the statute." *Id*. (Emphasis added).  As a result, the U.S. Supreme Court concluded that retroactivity was not at

issue because the state supreme court's interpretation had not *changed* the law. 531 U.S. at 226, 228 (emphasis added). The Supreme Court further held that the proper inquiry was whether, in light of the state supreme court's clarification of the statute's meaning at the time of the defendant's conviction, the conviction violated the defendant's due process rights. 531 U.S. at 226-29; *see also Bunkley v. Florida*, 538 U.S. 835, 840 (2003). The *Fiore* Court ultimately held that the petitioner's Fourteenth Amendment due process rights were violated when he was convicted of crime whose elements were not met; and reversed the petitioner's conviction. 531 U.S. at 229.

A subsequent U.S. Supreme Court decision applying *Fiore* reached a similar result. In *Bunkley v. Florida*, 538 U.S. 835 (2002), the defendant argued that in view of the Florida Supreme Court's determination, subsequent to the defendant's conviction for first-degree burglary, that a pocketknife with a blade of four inches or less was a "common pocketknife" in the state burglary statute, defendant's possession of a 2 ½ to 3-inch knife did not support his first-degree burglary conviction. 538 U.S. at 836-38. Citing *Fiore*, the U.S. Supreme Court vacated the judgment of the Florida Supreme Court that it had announced a change in, and not just a mere clarification of, the law at the time of the defendant's conviction. 538 U.S. at 842. The Court held that the Florida Supreme Court's statement that its holding was part of the "century-long evolutionary process" of the law was insufficient to determine whether the defendant's 2 ½ to 3-inch blade was a "common pocketknife" at the time of the defendant's conviction; and that the Florida Supreme Court should determine not only *whether* the definition of a "common pocketknife" changed, but *when* it changed. 538 U.S. at 839-842 (emphases in original).

In the present case, Petitioner frames Ground X as one that hinges upon a combined retroactivity and due process analysis (*i.e.*, due process will be violated if *Randolph* is not applied retroactively to Petitioner's armed robbery conviction). Pet'r Br. in Supp. of Am. Pet. at 5-6.

However, under *Fiore* and *Bunkley,* only one of the two analyses is necessary (either retroactivity or due process), depending on whether the Michigan Supreme Court's decision in *Randolph* (1) *changed* the requirements for an armed robbery conviction, or (2) merely *clarified* the law as it existed at the time Petitioner's armed robbery conviction became final.  *See Bunkley*, 538 U.S. at 840 ("Because [in *Fiore*] Pennsylvania law – as interpreted by the later State Supreme Court decision – made clear that [the petitioner's] conduct did not violate an element of the statute, his conviction did not satisfy the strictures of the Due Process Clause.  Consequently, 'retroactivity [was] not at issue'") (citing *Fiore*, 531 U.S. at 226.)  In the present case, therefore, if *Randolph* changed the requirements for an armed robbery conviction, it should not be applied retroactively, and Petitioner's armed robbery conviction and sentence stand.  *Id.*  However, if *Randolph* merely clarified the law as it existed at the time of Petitioner's 1994 conviction, the conviction for armed robbery violates due process because all of the elements of armed robbery were not present, specifically, Petitioner did not use force contemporaneously with the taking of the boots.  *See id.*

In *Randolph*, the Michigan Supreme Court held that it was "abandon[ing]" and "overrul[ing]" the transactional approach to robbery, which had been devised and applied over the course of 30 years by the Michigan Court of Appeals, because neither common law nor Michigan's robbery statutes "permit us to *adopt* the view espoused by the Court of Appeals and the dissent." 648 N.W.2d at 171, 172, 174 (emphasis added).  This indicates the Michigan Supreme Court's position that its decision in *Randolph* entailed a *change* in the law.  The Michigan Supreme Court's position that *Randolph* entailed a change, rather than a clarification of, the elements of armed robbery as they existed at the time of Petitioner's conviction is further indicated by its decision in this very case.  In its September 23, 2005 order reinstating Petitioner's armed robbery conviction, the court held,

> The decisions in *People v Randolph*, 466 Mich. 532 (2002), and *People v Scruggs*, 256 Mich App 303 (2003) are to be given limited retroactive effect, applying only to those cases pending on appeal in which the issue was raised and preserved. *People v Cornell*, 466 Mich 335, 367 (2002); *People v Pasha*, 466 Mich 378, 384 (2002).

*People v. O'Donnell*, 474 Mich. 867, 703 N.W.2d 473 (2005); Mich. Order, 9/23/05, docket #50. In so holding, the court appears to have indicated its position that the *Randolph* decision entailed a change in, rather than a clarification of, the law in effect at the time of Petitioner's armed robbery conviction. In *Pasha*, the Michigan Supreme Court overruled Michigan Court of Appeals precedent interpreting Michigan's concealed weapon statute. *Pasha*, 645 N.W.2d 275, 277-278 (Mich. 2002). In so holding, the court restricted the retroactive application of its holding to only those cases "currently pending on appeal" in which the particular aspect of the statute at issue had been raised and the defendant either preserved the issue for review or was entitled to relief for plain error. *Pasha*, 645 N.W.2d at 279 (referencing *People v. Carines*, 597 N.W.2d 130 (Mich. 1999) (holding unpreserved error in criminal case is deferentially reviewed for plain error affecting substantial rights)). The *Pasha* court limited retroactive application because "[p]rosecutors and courts have relied on *Marrow* [the court of appeals' interpretation of the statute] in deciding whether to charge or convict a defendant of [carrying a concealed weapon]. Full retroactive application of our holding would [therefore] undermine the interest in finality of convictions and disrupt the effective administration of justice." *Id*.

Under the standard of review mandated by the AEDPA, I find that the Michigan Supreme Court's decision in the present case, based on *Pasha* and *Cornell*, not to apply *Randolph* retroactively to invalidate Petitioner's armed robbery conviction, is consistent with U.S. Supreme Court precedent in *Fiore* and *Bunkley*. This case is crucially distinct from *Fiore* in that the Michigan Supreme Court's decision in *Randolph* was not, unlike that of the Pennsylvania Supreme Court

decision at issue in *Fiore*, the first interpretation of the statute at issue, such that it construed the law as it existed at the time of the defendant's conviction.  Rather, in the present case, the Michigan Supreme Court's interpretation of the robbery statute in *Randolph* explicitly "abandoned" and "overruled" 30 years of precedent in the Michigan Court of Appeals applying the "transactional approach" to robbery.  *Randolph*, 648 N.W.2d at 171-72, 174.  As in *Pasha*, prosecutors and courts have undoubtedly relied on the prior state of the law (*i.e.*, the transactional approach to robbery as established by years of Michigan Court of Appeals precedent) in deciding whether to charge or convict on robbery.  The Michigan Supreme Court's decision in this case is therefore consistent with *Fiore*, which mandates against retroactive application of a change in the law as it existed at the time of the defendant's conviction.  *Fiore*, 531 U.S. at 226-29.  Because the Michigan Supreme Court's decision on this issue is consistent with U.S. Supreme Court precedent, habeas relief based on Ground X is not warranted.

Habeas relief is likewise unwarranted based on Petitioner's ineffective assistance claims in Ground X.  He argues that both trial and appellate counsel were ineffective because they did not seek to vacate his armed robbery conviction based on the *Randolph* and *Scruggs* decisions.  Pet'r Br. in Supp. of Am. Pet. at 10-11.  Because he raised his Ground X *Randolph* and *Scruggs* ineffective assistance of counsel arguments in his second motion for relief from judgment and before both state appellate courts, these ineffective assistance claims are exhausted.  The claim is meritless.  Petitioner's trial took place in 1994.  *Randolph* and *Scruggs* were decided in 2002 and 2003 respectively, thus trial counsel could not possibly have argued that those cases invalidated the armed robbery charge.  Petitioner was represented by counsel only in his direct appeal, which was filed in 1995 and concluded in 1999, before either *Randolph* or *Scruggs* were decided.  I note that Petitioner's trial and appellate counsel both sought to dismiss the armed robbery charge and/or

invalidate his conviction thereunder pursuant to existing law.  Petitioner represented himself in his 2002 and 2003 appeals – during which time the Michigan courts decided Randolph and Scruggs, and thus the two cases could have been brought to the attention of the state appellate courts.  Therefore, only Petitioner is responsible for the failure to raise *Randolph* and *Scruggs* in those appellate proceedings.  Petitioner is not entitled to habeas relief for his Ground X ineffective assistance of counsel claim.

### K. Ground XI: Retroactive Application of *People v. Scruggs* to Vacate Petitioner's Armed Robbery Conviction

Petitioner finally argues the Michigan Court of Appeals decision in *People v. Scruggs*, 662 N.W.2d 849 (Mich. Ct. App. 2003), which applied *Randolph* to Michigan's armed robbery statute for the first time, should be retroactively applied to invalidate Petitioner's armed robbery conviction.  Pet'r Br. in Supp. of Am. Pet. at 5-14.  Petitioner contends that a failure to apply *Scruggs* to his case would entail a violation of his Fourteenth Amendment Equal Protection rights because the facts in *Scruggs* (as well as *Randolph*) are almost identical to the facts in Petitioner's case.  Pet'r Br. in Supp. of Am. Pet. at 9, 11-14.

In *Scruggs*, the defendant stole a telephone from a store.  662 N.W.2d at 853.  When store loss prevention employees followed the defendant out into the parking lot and confronted him, the defendant struggled with one of the employees.  *Id*.  The employee let the defendant drive away when he saw the defendant had a knife; the employee thereafter noticed a laceration on one of his hands.  *Id*.  Citing *Randolph*, the court of appeals reversed the defendant's armed robbery conviction and remanded for entry of conviction on the lesser instructed offense of larceny in a building.  662 N.W.2d at 854.  The court specifically held that "[b]ecause defendant used a knife against store employees to effectuate his escape from the parking lot, rather than before, or contemporaneous

with, the taking of the telephone from inside the store, insufficient evidence was introduced at trial to support a conviction of armed robbery pursuant to M.C.L. § 750.529." 662 N.W.2d at 853-54.[13]

As he did with the *Randolph* decision, Petitioner argues that *Scruggs* was a "correct application" of the armed robbery statute, rather than a change in law; thus it should be applied retroactively here because the facts are on point. Pet'r Br. in Supp. of Am. Pet. at 12. In support of this ground, Petitioner quotes from a United States Supreme Court holding for which he provides neither name or citation which purportedly stated, "Due Process requires that a state Supreme Court decision which is issued after Petitioner's conviction becomes final and which did not articulate a new rule but merely interpreted the elements of the statute under which Petitioner was convicted, must be applied on collateral review of Petitioner's Claim [sic]." Pet'r Br. in Supp. of Am. Pet. at 13.

Like the Michigan Supreme Court's *Randolph* decision, the Michigan Court of Appeals' *Scruggs* decision should not be applied retroactively to invalidate Petitioner's armed robbery conviction. Like *Randolph*, *Scruggs* entailed a *change* in the law as it existed at the time of Petitioner's armed robbery conviction. In fact, *Scruggs* was the Michigan Court of Appeals' first application of the new law, rejecting the transactional approach, as established by *Randolph* (*i.e.*, the Court of Appeals' first decision in which it did not apply the transactional approach to robbery). *Scruggs*, 662 N.W.2d at 853-54. Because the Michigan Supreme Court's decision not to apply *Scruggs* to Petitioner's armed robbery conviction case was therefore consistent with U.S. Supreme Court precedent in *Fiore*; habeas relief is not warranted based on Ground XI.

---

[13]The continued viability of *Scruggs* has been called into question in light of the Michigan Legislature's amendments to the robbery statutes to reinstate the transaction approach. *See People v. Mathis*, No. 251750, 2005 WL 602527, at *1 (Mar. 15, 2005) (citing *People v. Morson*, 685 N.W.2d 203, 211-212 (Mich. 2004) (Corrigan, C.J., concurring)).

- 64 -

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that Petitioner's habeas corpus petition be denied.

I also recommend, pursuant to 28 U.S.C. § 2253(c)(2), that the Court deny a certificate of appealability as to Grounds I through XI.

Dated:  January 8, 2007                          /s/ Hugh W. Brenneman, Jr.
                                                 Hugh W. Brenneman, Jr.
                                                 United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).